**Harlan C. HARRIS, Plaintiff-in-Error,**

v.

**The STATE of Oklahoma, Defendant-in-Error.**

**No. A–14204.**

Court of Criminal Appeals of Oklahoma.

Dec. 4, 1968.

Jay D. Dalton, Tulsa, for plaintiff in error.

G. T. Blankenship, Atty. Gen., Hugh H. Collum, Asst. Atty. Gen., for defendant in error.

BRETT, Judge:

Appellant, Harlan C. Harris, was tried in the court below on an information filed in the District Court of Tulsa County, charging him with murder of Floyd Conner. The jury, on September 12, 1966, found him guilty of manslaughter in the first degree, and assessed his punishment at imprisonment in the penitentiary for a term of not less than ten, nor more than thirty years. From the judgment duly pronounced in pursuance of the verdict, this appeal is lodged.

Plaintiff in error, hereinafter referred to as the defendant, presents two contentions of error: First, error of the court committed during the course of said trial in refusing to permit the introduction of certain testimony and evidence in behalf of the defendant. Second, prejudicial error committed by the prosecutor, which was objected to by this defendant, but not sustained by the court, resulting in defendant receiving an excessive sentence.

In this case one State witness actually placed the defendant at the scene of the crime, and was responsible for his ultimate apprehension even though defendant testified that he intended to turn himself in to the police. Mrs. Willie Mae Manier testified that she had seen both defendant and the deceased during the evening and the

early morning of April 17, 1966, at the Grand Prix Club in Tulsa. She said that she left the Grand Prix Club about 7:00 o'clock in the morning of April 17th, and went toward the vicinity of another club, called the Bonneville Club, where she sat on the fender of an automobile parked at the curb. The Bonneville Club is located immediately south of the Oklahoma Eagle Newspaper office. Later Floyd Conner [the deceased] came down the sidewalk "talking and rambling on." She testified that on several occasions Conner approached a group of people and told them to stop laughing, or they would be paralyzed in their tracks. Her testimony related, that during this same period of time defendant came down the street and asked her what was wrong with him (Conner), so she answered, "He is drunk, I guess." She continued, that the deceased approached defendant and with profane emphasis re-marked it was none of defendant's business, but that defendant did not answer and moved around to the side of the car; and that deceased followed defendant throwing up his arms and cursing, and calling de-fendant vile names. Defendant backed off the curb around to the side of the car and said, "Don't come up on me." but the deceased replied to defendant, "go ahead and kill me," and repeatedly called defend-ant vile names, the witness related. She said then, that she heard three shots and saw the deceased, Floyd Conner, grab his stomach and he "just wheeled right quick and started towards the Oklahoma Eagle Newspaper office, and fell on the sidewalk in front of that building." In her testimony, the witness related that she never did see a knife, or any weapon, in the hands of or about the deceased.

Four police officers testified, but none of them testified that he saw a knife, or any other weapon around the deceased, where he fell.

The defendant testified in his own behalf and admitted that he was at the Grand Prix Club, but denied knowing the deceased, and denied seeing Mrs. Willie Mae Manier.

He stated that he heard someone say, "I am going to get you, you black * * *;" and when he looked up the street, he saw the deceased coming with his hands up, and with a knife in one hand. Defendant stated that he backed entirely across the street, but the deceased kept coming toward him, calling him vile names. Defendant admitted that he shot the deceased, Floyd Conner, but he contended the shooting was done in self-defense because he was afraid of the man and feared for his own life.

Defendant stated, that after he fired the shots he went across the street and hid the gun in Georgiola's Cafe. A few hours later, with the aid of defendant, the police found the pistol where defendant said he had hidden it.

This homicide occurred about 7:00 o'clock in the morning. The officers arrested the defendant at his home at 720 North Madi-son. Soon thereafter defendant and the officers went to defendant's hotel room at 1207 Lansing, where he had been staying, and the officers searched the room for the gun, without finding it. Defendant then informed the officers that he hid the gun in the cafe, so they went to Georgiola's Cafe where they found the gun. The de-fendant was then taken to the police station, between 10:30 and 11:00 o'clock.

The officers testified that defendant made three telephone calls in an attempt to reach his attorney without success. Sub-sequently, after being fully advised as to his rights, defendant made a statement. The State did not offer the statement in evidence but during the trial the defense counsel asked the County Attorney to give him a copy of the statement, stating that he want-ed to introduce the statement in evidence, to corroborate the story defendant had offered when he testified at the trial. The County Attorney refused to give defendant's at-torney a copy of the statement, and the trial court denied defendant's motion to require such be provided for the purpose of corroboration. Counsel for defendant now contends the trial court erred in refus-ing his request.

The trial judge, in refusing the defendant's request for a copy of the statement, said:

"The written statement itself is filled with exculpatory statements, self-serving statements, it would be repetitious, it is inadmissible, there were no admissions against interest contained in the statement, other than what he has given here today."

■ In Bruton v. State, Okl.Cr., 305 P.2d 1045, this Court said:

"If the defendant had confessed to the officers at the jail after the homicide, such statements, if voluntary, would of course have been admissible. But statements not spontaneously made at the scene, but at a time minutes removed, and self-serving, could not be shown by the defendant."

Under the circumstances, we are of the opinion that the trial court did not err in refusing to require the prosecution to furnish the statement to the defendant. This is so, especially in view of the fact that the attorney had seen the statement the day before; and, as well for the reason, the defendant testified to the same facts in the trial of the case.

■ Where there is conflict in the testimony, it is the exclusive province of the jury to weigh the evidence and ferret out the truth, and if there is competent evidence to support the jury's findings this court will not disturb the verdict on appeal. Goodnight v. State, Okl.Cr., 366 P.2d 957; Ryans v. State, Okl.Cr., 392 P.2d 501; Austin v. State, Okl.Cr., 419 P.2d 569.

■■ We have often said that it is for the jury to determine—under all the evidence and under proper instructions from the court—whether appearances of danger were real, or apparently real, so as to justify action in self-defense. In this case the jury was not impressed with defendant's theory of self-defense.

■ Defendant's second proposition is that the judgment and sentence is excessive.

We cannot say that the penalty assessed is excessive. The defendant was charged with murder, and could well have received the death penalty, or life imprisonment.

The judgment and sentence is affirmed. Affirmed.

NIX, P. J., and BUSSEY, J., concur.