THE STATE OF MONTANA, Plaintiff and Respondent, *v.* STEVE LOGAN, Defendant and Appellant.

No. 11668.
Submitted June 29, 1970.
Decided Aug. 20, 1970
473 P.2d 833.

McKeon & Brolin, John L. McKeon, argued, Anaconda, for defendant-appellant.

Robert L. Woodahl, Atty. Gen., Robert P. Cannon, Asst. Atty. Gen., argued, Helena, Carl M. Davis, County Atty., argued, Dillon, for plaintiff-respondent.

MR. JUSTICE HASWELL delivered the Opinion of the Court.

Defendant was charged with the crime of first degree murder in the district court of the fifth judicial district, Beaverhead County. Trial was had before the Hon. Philip C. Duncan, district judge, presiding with a jury. The jury returned a verdict of voluntary manslaughter. Judgment was entered thereon imposing a sentence of ten years imprisonment with the last five years suspended. Following Judge Duncan's denial of defendant's motion for a new trial, defendant appeals from the judgment and denial of a new trial.

The basis of the murder charge was a shooting that occurred in the Moose Bar in Dillon, Montana about 2 a.m. on July 22, 1968. Defendant Steve Logan, the operator of the bar, shot

Henry A. Hoerster, Jr., a customer of the bar, three times during an altercation between them in the aisle or passageway behind the bar. The affray arose when defendant Logan unplugged the jukebox preparatory to closing the bar and Hoerster asked for the return of his dime which he had just put into the jukebox. Logan took a dime from the cash register behind the bar and laid it on the bar for Hoerster. The testimony is conflicting as to whether Logan or Hoerster then said ''Don't get smart'' or words to that effect.

In any event, Hoerster vaulted over the bar to where Logan was standing by the cash register, struck Logan, and a scuffle ensued. This was variously described by different witnesses as either a fist fight or more of a wrestling match, depending on which witness was testifying. However characterized, it resulted in Hoerster forcing Logan down the passageway behind the bar to the vicinity of the east wall where Logan somehow evaded Hoerster and proceeded in the opposite direction toward the cash register or toward the west end of the bar  There is a sharp conflict in the testimony as to whether the altercation broke off at this point.

Logan obtained a .38 caliber, 5-shot, Smith and Wesson revolver either from a drawer near the cash register or from a desk near the west end of the bar. The testimony is also conflicting as to whether Hoerster continued the affray by following Logan up the passageway behind the bar or whether Logan proceeded toward Hoerster at the east end of the bar. Be that as it may, Logan shot Hoerster three times, twice from the front and once in the back. Hoerster fell to the floor under the bar gate near the east end of the bar. The three bullets were subsequently recovered, one imbedded in the north wall of the bar and the two that had penetrated through the east wall of the bar. Only one of the bullets caused a fatal wound and the evidence indicated it was the last shot fired and that it hit the heart of the deceased from the front. The entire altercation, according to the woman bartender, lasted from 18 to 22 seconds.

Defendant Logan was not arrested until after the coroner's inquest some four days later. On July 29, 1968, the county attorney applied to the district court for leave to file an information direct against Logan. Leave was granted, and a direct information was filed charging defendant with first degree murder. Defendant entered a plea of "not guilty". On August 7, defendant filed notice of his intention to claim self-defense.

Subsequently defendant filed a motion for a change of venue claiming that he could not receive a fair and impartial trial in Beaverhead County because of community-wide bias and prejudice against him throughout the county. His application was supported by affidavits; counteraffidavits were filed by the county attorney. A closed hearing was held on October 25, 1968, at which time the testimony of various public officials, civic leaders, businessmen and residents of the county was given. On November 12, 1968, counsel was notified of the court's ruling thereon. Although a copy of this ruling is not in the court's file, it is conceded that the motion for a change of venue was denied at that time. Almost immediately thereafter, defendant's motion for a continuance of the trial from December 2, 1968 to February 3, 1969 was granted.

Trial commenced on February 3, 1969 before Judge Duncan. Thirty-six jurors were examined; eight were excused for cause. The remaining twenty-eight were passed for cause by both prosecution and defense. Prior to exercising peremptory challenges, defendant renewed his motion for a change of venue. Additional testimony was taken from defendant's attorneys. The court again denied the motion with leave to renew it later in the process of jury selection. Each side exercised its eight peremptory challenges and the remaining twelve persons were sworn as the trial jury. Defendant did not again renew his motion.

The trial itself commenced on February 5. The jury returned its verdict on February 13, finding defendant Logan guilty of voluntary manslaughter. On February 21 Judge Duncan denied defendant's motion for a new trial and immediately

thereafter sentenced him to ten years imprisonment in the Montana State Prison with the execution of the last five years of the sentence concurrently suspended.

Defendant lists nine specifications of error to be determined upon appeal. These can be consolidated and summarized into six underlying issues:

(1) Is the absence of a supporting affidavit for leave to file an information direct in the district court fatal?

(2) Did the district court err in denying defendant's motion for a change of venue?

(3) Was reversible error committed in admitting certain photographs and a store dummy into evidence or in permitting the prosecution to use a certain chart in its closing argument?

(4) Did the district court commit error in disallowing evidence of the deceased's character and reputation for turbulence and violence?

(5) Was the verdict contrary to six jury instructions given by the court?

(6) Did the district court err in refusing defendant's proposed instruction No. 47 on reasonable doubt?

Turing our attention to the first issue, defendant contends the district court lacked jurisdiction to try him because the county attorney failed to file a supporting affidavit containing sufficient facts to show probable cause with his application for leave to file the information direct.

The application for leave to file the information direct reads as follows:

"Application of county attorney for leave to file information. Comes now Carl M. Davis, the duly elected, qualified and acting County Attorney within and for the County of Beaverhead, State of Montana, and respectfully asks leave of this Court to file without a preliminary examination before a Committing Magistrate an information against the above-named defendant charging him with the crime of Murder committed in the County of Beaverhead, State of Montana, on the 22nd day of July 1968,

and the said County Attorney states that in his opinion there is sufficient evidence against said defendant to warrant the filing of said information for said crime, and to warrant and to require a trial of said matter before this Court, and that upon a trial of said matter a conviction would be procured.''

The record discloses no supporting affidavit or other showing of probable cause. The controlling statute is section 95-1301, R.C.M.1947, reading as follows:

''(a) The county attorney may apply directly to the district court for permission to file an information against a named defendant. The application must be by affidavit supported by such evidence as the judge may require. If it appears that there is probable cause to believe that an offense has been committed by the defendant the judge shall grant leave to file the information, otherwise the application shall be denied.''

We must concede that the statute was violated insofar as the record shows. But is this a jurisdictional requirement voiding the verdict and judgment? We think not, and counsel has cited no authority supporting his contention.

In the instant case it is clear from the record at the trial that the state had sufficient facts to establish probable cause for the filing of the information direct in the district court, even though no affidavit was filed by the county attorney and the record is silent concerning the showing made to the district judge. The record discloses a detailed investigation by law enforcement officers, an autopsy, and a coroner's inquest prior to application for leave to file the information direct. At this time defendant had admitted that he had shot the deceased three times; the physical evidence indicated that the deceased had been shot twice from the front and once in the back; and, the circumstances indicated at least arguably that the shooting was unjustifiable as involving excessive force. So what is really involved here is not whether probable cause existed for filing an information direct, but whether an affidavit containing the salient facts is indis-

pensable. This is patently a procedural matter, not a substantive issue involving the jurisdiction of the court.

The objection now raised on appeal was waived in the trial court by the failure of defendant to object to the absence of the affidavit or the absence of a record showing probable cause. Section 95-1702, R.C.M.1947, provides in pertinent part:

"Defenses and objections based on defects in the institution of the prosecution or in the  *  *  *  information other than that it fails to show jurisdiction in the court  *  *  *  may be raised only before the trial by motion to dismiss or for other appropriate relief. The motion shall include all such defenses and objections then available to the defendant. Failure to present any such defense or objection as herein provided constitutes a waiver thereof  *  *  *."

Section 95-1608, R.C.M.1947, further provides:

"No irregularity in the arraignment which does not affect the substantial rights of the defendant shall affect the validity of any proceeding in the cause if the defendant pleads to the charge or proceeds to trial without objecting to such irregularity."

Accordingly, the failure of defendant to raise the objection together with his entry of plea, with counsel, precludes his contention now that it was error to have permitted the filing of the information direct No prejudice was involved, only a procedural matter not affecting the substantial rights of defendant.

Proceeding to the second issue, defendant contends the district court, in denying his motions for change of venue, committed reversible error in violation of his rights under the Sixth Amendment to the United States Constitution and Article III, Sec. 16 of the Montana Constitution. Both constitutional provisions guarantee to the accused the right to be tried by an impartial jury. Defendant contends that county-wide prejudice existed against him foreclosing the selection of an impartial jury in Beaverhead County for his trial.

At the outset it is apparent that if such is the fact, reversible error was committed in denying him a change of venue elsewhere. Hence, we must look to the showing made to the district judge both in support of and in opposition to defendant's contention.

Defendant's first motion for change of venue was filed on October 11, 1968 and heard on October 25, 1968. Three affidavits were filed in support of this motion, those of the two defense counsel and one by a Dillon newspaper publisher. In addition, defendant called four witnesses at the hearing, the two defense counsel, a deputy clerk of court, and the sheriff. In opposition to defendant's motion the county attorney filed twenty counter-affidavits of public officials, businessmen, ranchers and various other residents of the county, including his own. The county attorney personally testified at the hearing on behalf of the state.

Defendant's affidavits generally indicate thaat affiants are in a position to know the county-wide feeling of bias and prejudice against the defendant and based upon such knowledge affiants conclude that because such county-wide bias and prejudice in fact exists, defendant cannot receive a fair trial in Beaverhead County. These affidavits refer to the existence of unfounded rumors circulating throughout the county to the effect that defendant is a "fence" for stolen property, engaged in the narcotics traffic, involved immorally with young girls, a "fixer" of local law enforcement officials, guilty of "cheating customers", and generally engaged in illegal activities. They also mention that some people refused to sign defendant's bail bond for fear of reprisal by their neighbors and that three bail bondsmen who did sign had been intimidated and harassed but refused to sign affidavits to that effect for fear of economic reprisal. Reference is also made to certain alleged inflammatory newspaper articles.

The counter-affivadits in opposition to a change of venue were made by the sheriff, chief of police, city attorney, legislators, commissioners, city officials, school officials, businessmen, ranch-

ers, and other residents of Beaverhead County. The substance of most of these affidavits was that they had not heard the rumors alleged in the affidavits of defendant, denied knowledge thereof, and knew of no bias or prejudice existing against defendant to the extent of denying him a fair and impartial trial.

The testimony at the hearing, although more detailed, was not significantly different from the general tenor of the affidavits. It did include conversations with named members of the jury panel, indicating their awareness of prejudice against defendant and indicating a prejudgment against him without knowledge of the facts. None of these named members of the jury panel served on the trial jury that convicted defendant.

The most that can be said for the affidavits and testimony is that they were inconclusive as to the existence in fact of county-wide bias and prejudice against the defendant. The facts contained in the affidavits and testimony demonstrated only a few instances of this among a small number of persons. Other than that, there was only the conclusion of three affiants and perhaps two witnesses that such was a fact. On the other hand, the record disclosed that sixteen residents had signed defendant's bail bond; that he had more visitors while in jail than anyone else ever had; that defendant had continued his business without incident following the shooting; and, that about twenty persons in the community who were in a position to know and determine community attitudes denied knowledge of the existence of the rumors or prejudice against defendant.

■ The county-wide bias and prejudice alleged against defendant is based on unfounded rumors and newspaper articles. We find nothing prejudicial or inflammatory in the newspaper articles. They constitute nothing more than a printing and dissemination of general news concerning the case and as a consequence are unobjectionable. Defendant cites State v. Dryman, 127 Mont. 579, 269 P.2d 796, in support of his position. The newspaper articles in that case are in no way comparable to those in the instant case and accordingly lend no support to de-

58

fendant's position here. See also: State v. Corliss, 150 Mont. 40, 430 P.2d 632; State ex rel. Hanrahan v. Dist. Ct., 145 Mont. 501, 401 P.2d 770

A clear abuse of discretion by the district judge in denying a change of venue is required to support reversal of his denial. State v. Bischert, 131 Mont. 152, 308 P.2d 609; Petition of Larocque, 139 Mont. 405, 365 P.2d 950. Additionally, even if county-wide prejudice existed in October, it may not have existed at the time of trial, the following February. We find no abuse of discretion in Judge Duncan's denial of defendant's initial motion for change of venue.

Defendant renewed his motion for change of venue at the time the jury panel had been passed for cause by both the state and defendant, and before either had exercised any peremptory challenges. The renewed motion was based on the showing made the preceding October and upon the supplementary affidavits of the two defense counsel. These supplementary affidavits related incidents concerning three members of the jury panel, none of whom served on the trial jury, who allegedly thought defendant should be found guilty; alleged statements by various members of the community that defendant should be convicted; and, alleged statements by some of the persons who signed the counter-affidavit that it would be difficult for defendant to get a fair trial. None of the persons named were produced in support of the affidavit. We find nothing in this supplementary showing to indicate an abuse of discretion by the district judge in denying defendant's motion with leave to renew after the trial jury was finally selected. The alleged statements of three members of the jury panel who allegedly thought defendant should be found guilty are not prejudicial because these prospective jurors did not serve on the trial jury that convicted defendant; their alleged statements as to defendant's guilt are nothing more than opinions without knowledge of the facts and do not support the existence of county-wide bias and prejudice against the defendant. The remainder of

the affidavits are nothing but conclusions of opinion by affiants and fall far short of establishing the existence of county-wide bias and prejudice. The previous affidavits and testimony taken in October are stale and do not reflect the situation at the time of trial.

Furthermore, the motion was never renewed at the time the jury had been finally selected. Both the state and defendant had exercised all eight of their peremptory challenges. Another eight jurors had been excused for cause. It has never been contended that the remaining twelve who comprised the trial jury were anything but fair and impartial or had any preconceived prejudice against defendant. Both the state and defendant, after opportunity to examine all prospective jurors, passed these twelve jurors for cause. Under such circumstances it cannot be said that the district court abused its discretion in denying defendant's motion for change of venue.

The third issue relates to the admissibility into evidence and use of various exhibits and a chart. Defendant claims error by the district court in admitting into evidence a picture of the deceased on the floor of the Moose Bar thereby establishing a pattern for the later admission of photographs of the deceased on a slab in the funeral home, the use of a store dummy or mannequin to illustrate the path of the three bullets through the deceased, and the use of a chart prepared by the state for its final argument to the jury.

State's exhibit No. 8, was a photograph of the deceased lying on the floor of the Moose Bar taken shortly after the shooting. It was admitted in evidence over defendant's objection that "it wouldn't appear to be material. It's a body." The applicable law on the admissibility of photographs in a criminal proceeding is contained in the following statement in State v. Bischert, 131 Mont. 152, 159, 308 P.2d 969, 972:

"The law on the admissibility of photographs was stated by this court in Fulton v. Chouteau County Farmers' Co., 98 Mont. 48, 61, 62, 37 P.2d 1025, 1029: '* * * photographs stand on

the same footing as diagrams, maps, plans, and the like, and as a general rule, whenever relevant to describe a person, place, or thing, they are admissible for the purpose of explaining and applying the evidence and assisting the court and jury in understanding the case.'

"Photographs that are calculated to arouse the sympathies or prejudices of the jury are properly excluded, particularly if they are not substantially necessaary or instructive to show material facts or conditions. (Citing authority)"

State's exhibit No. 8 was clearly probative and material. It tended directly to prove the corpus delicti which the state was required to prove before proceeding with proof of defendant's guilt. We find nothing inflammatory or prejudicial in the photograph and no such objection was raised at the trial. The exhibit was clearly admissible.

Three other photographs of the deceased on a slab in the funeral home were admitted in evidence without objection. Therefore, their admissibility cannot now be raised on appeal. Defendant's contention that the prior ruling of the court on state's exhibit No. 8 set the stage for the admission of these three photographs and excused the defendant from objecting to them not only is novel but is an incorrect statement of the law. Objections to the admissibility of evidence must be made in trial court or such objections are waived and cannot be raised for the first time on appeal.

The same thing can be said about the admission in evidence for illustrative purposes of the store mannequin. This mannequin was admitted without objection; it was used to trace the path of the three bullets through the deceased's body by piercing the mannequin accordingly and using dowels to indicate the paths of the bullets. As the admission into evidence and use of the mannequin was never objected to at the trial, the issue cannot be raised for the first time on appeal.

█ Finally, and perhaps more importantly, we find nothing objectionable in any of the exhibits or the use that was made of them at the trial.

█ Defendant also objects to the denial by the trial court of his motion in limine to prohibit the use of a chart prepared by the state in its final argument to the jury. The chart was denominated "Bulletholes in the Body"; it was prepared by the state and to a degree involves computations made by the state not directly testified to upon the trial; it was not admitted in evidence.

We hold, under the circumstances in the instant case, that the use of the chart by the county attorney during his final argument was a matter of discretion with the district judge and in the absence of a showing of abuse thereof, we will not interfere. The chart was nothing more than a visual aid utilized by the county attorney in this argument to clarify and assist the jury in understanding the state's argument. It was based on evidence introduced at the trial with the mathematical computations based thereon carried out. The fact that the chart itself had not been introduced in evidence is not controlling; the use of computations on blackboards, butcher paper, and illustrative devices of various sorts not introduced in evidence in aid of presentation of the attorney's final argument being relatively common and ordinarily unobjectionable in the absence of special circumstances not present here.

The fourth issue for review concerns the correctness of the district court's denial of defendant's offers of proof No. 1 and 2. These relate to defendant's offer to prove, in aid of his plea of self-defense, that the deceased had a reputation for turbulence, violence and trouble-making. Defendant contends that denial of these offers of proof constitutes reversible error.

Before discussing this issue, an understanding of the circumstances under which the denial was made is indicated. The state's first witness in its case-in-chief was Officer Berkley of the Dillon police who arrived at the bar shortly after the shoot-

ing and testified generally as to what he found there at that time and what he did thereafter. The state's second witness was Mildred Jones, the woman bartender at the Moose Club on the night in question. Her testimony generally indicated an unprovoked and unjustified assault by the deceased upon defendant Logan and a continuing struggle, with the deceased being the aggressor. She left the bar to call the police when the trouble started and did not see part of the struggle. She returned to the bar as the final shot was fired. Alfred Bay was the state's third witness. He was an eyewitness to the altercation and shooting, and generally testified as to what he saw. The fourth witness for the state was Leo Williams, the Dillon Chief of Police, who arrived shortly after the shooting and testified concerning what he saw and did after arrival and during the course of his investigation. On cross-examination of this witness, defendant's attorneys sought to elicit from him testimony and documentary evidence concerning the deceased's character and reputation for turbulence and violence. At this point defendant's exhibit B, an FBI "rap sheet," was marked for identification and the following colloquy occurred:

"Q. I would hand you a document here, Mr. Williams, and I'd ask you if you have seen that before? A. I think I have a copy of it.

"Q. Incidentally what is it?

"MR. CARL DAVIS (county attorney): Now to this we object, it's improper cross-examination, incompetent, irrelevant, immaterial, no proper foundation's been laid for the introduction of any evidence of this nature.

"THE COURT: Let me see it. Sustained."

A few questions later this exchange transpired:

"Q. Did you inquire from other law enforcement officials throughout the State of Montana anything about the victim, Henry Hoerster?

"MR. CARL DAVIS: To this we object as incompetent, irrelevant, immaterial, improper cross-examination, no proper foundation's been laid.

"THE COURT: Sustained

"Q. I believe you testified that you personally did not know Mr. Hoerster? A. I did not know him, no.

"Q. Did any of the members of your staff know him? A. No, I'm sure they didn't.

"Q. Did you inquire around the other taverns in town about him? A. Some, yes.

"Q. And did you learn anything? A. Not in the taverns, no.

"Q. Did you learn anything anywhere?

"MR. CARL DAVIS: Now to this we object. It's incompetent, irrelevant, immaterial, improper, and counsel should be admonished.

"THE COURT: I'm going to ask counsel for defense to make an offer of proof, and not to continue on this line until after an offer of proof has been made."

Thereafter, outside the presence of the jury, defendant's offer of proof No. 1, the objections thereto, and the court's ruling, was as follows:

"MR. FRANK DANIELS (defendant's counsel): Comes now the defendant for his offer of proof No 1 and offers to prove by the witness on the stand that the victim Henry Hoerster had a reputation throughout the State of Montana for turbulence and violence and trouble-making, particularly in bars and taverns, which this witness has reason to believe, has knowledge of and particularly documentary evidence obtained by this witness and other authorities from the Federal Bureau of Identification, in fact, confirming the reputation of the victim for such violence and turbulence and conviction of burglary and for contributing to the delinquency of a minor. The defendant expects to elicit this evidence in support of his plea of self-defense and by way

64

of justification and excuse for the fatal shooting involved in this cause and for his contention that the victim was the aggressor in the altercation.

"MR. CARL DAVIS: To which the State objects on the grounds it's incompetent, irrelevant, immaterial, no proper foundation has been laid for the admission of such testimony.

"THE COURT: Objection sustained and the offer of proof is refused."

A second offer of proof was made confining the reputation of deceased to the communities of Hinsdale and Fort Peck. The same objections were made thereto and sustained by the court.

Evidence of the deceased's character and reputation as to turbulence and violence is admissible as an exception to the hearsay rule under certain well defined circumstances. State v. Jones, 48 Mont. 505, 519, 139 P. 441, 446, defines the admissibility of such evidence in this language:

"While there is some diversity in the opinions of the courts as to whether evidence of the reputation of the deceased is competent for any purpose unless it is known to the defendant at the time of the homicide (and evidence of such knowledge was not introduced at the trial of this case), the weight of authority, we think, gives support to the rule that when, as in this case, *the issue is self-defense and there is doubt as to who was the aggressor,* such evidence is admissible in order to enable the jury to resolve the doubt * * *".

See also: 1 A.L.R.3d 571, and Evans v. United States, 107 U.S.App.D.C 324, 277 F.2d 354, to like effect.

From the foregoing, it is apparent that the existence of the issue of self-defense and an issue as to the aggressor in the altercation is necessary before corroboration by evidence of the deceased's reputation for turbulence and violence is admissible. Here no such issues had yet been raised in the case at the time the offers of proof were made. The state was proving its case-in-chief and the defense of self-defense had not yet been raised. There was no issue at this point as to who was the aggressor, all

testimony indicating that the deceased was the aggressor. The county attorney objected for the reason that no proper foundation had been laid for admission of this testimony. The court did not rule generally on the abstract question of the admissibility of this type of testimony, but denied the offers of proof under the then existing posture of the case. Defendant did not thereafter, as part of his defense, seek to raise the issue by the testimony of Chief of Police Williams although he was listed as one of the witnesses in support of defendant's claim of self-defense.

The notice of intention to rely on self-defense served by defendant on the state prior to trial is immaterial and does not place this matter in issue at the trial. Defendant is not bound to rely on this defense at the trial notwithstanding service of this notice. Until such time as defendant took the stand and admitted the killing, the issue of self-defense was not joined at the trial. Thus no foundation then existed for the admission of this testimony.

Neither can defendant's contention that the testimony was admissible to show the defendant's state of mind be upheld. The offer of proof indicated otherwise. There was nothing to indicate that defendant was aware of the deceased's character and reputation for turbulence and violence. This evidence could not have affected defendant's state of mind.

For the foregoing reasons we hold that the district court was correct in its denial of defendant's offers of proof No. 1 and No. 2.

The fifth issue for determination upon appeal is whether the jury verdict is contrary to and in direct violation of six jury instructions given by the court. These instructions are Nos. 27, 29, 30, 31, 32 and 35 and deal with various aspects of the law relating to self-defense and justifiable homicide. Defendant contends the verdict convicting defendant of manslaughter violates these instructions in that the evidence shows defendant was in fear of his life and necessarily shot the deceased to protect himself.

It is true that this is the effect of defendant's testimony, but there is other testimony by the state's witnesses and other evidence to the contrary. At issue was whether defendant really acted in self-defense, and, if he did, whether excessive force was used out of proportion to the apparent danger. The state's evidence showed that three shots were fired by the defendant without warning, two of them from the front and one in the back. Witnesses, Harper, Seybold and Potratz testified the fight had stopped and defendant went back up the bar, got a gun, and shot the deceased. The physical evidence indicated the deceased was shot near the east end of the bar some distance away from where defendant obtained the gun; one shot being fired within five feet of the deceased. Harper and Seybold testified that Harper yelled to defendant not to shoot, when Harper saw defendant with the gun.

Notwithstanding defendant's testimony the jury could properly find under this evidence and the law contained in the six designated jury instructions that the defendant, in shooting the unarmed Hoerster three times, used excessive force out of all proportion to the apparent danger to himself. Thus the verdict of voluntary manslaughter is entirely consistent with the six jury instructions and defendant's contention fails.

The final issue is whether the district court was in error in refusing defendant's proposed instruction No 47. This instruction reads as follows:

"You are instructed that if you have a reasonable doubt as to whether the homicide was justifiable you must give the defendant the benefit of that doubt and acquit him."

This instruction on reasonable doubt is fully covered by court's instructions No. 2, 4, 5, 15, 16 and 22 given to the jury. Refusal to give an instruction already covered by other instructions is not error. As we observed in State v. Lagge, 143 Mont. 289, 295, 388 P.2d 792, 795:

"We have often held that it is not error for a trial court to refuse to give a requested instruction, or by implication a por-

tion thereof, if the instruction's legal theory was adequately covered by the instructions that were given and as long as the rights of the defendant were fully protected. (Citing authority)."

The judgment of the district court is affirmed. Let the remittitur issue forthwith.

MR. JUSTICES CASTLES, JOHN C. HARRISON and DALY, and The Honorable TRUMAN BRADFORD, District Judge, sitting in place of MR. CHIEF JUSTICE JAMES T. HARRISON, Concur.