**Wesley Wayne WILLIAMS, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–94–741.

Court of Criminal Appeals of Oklahoma.

April 16, 1996.

Rehearing Denied May 13, 1996.

Duane Miller, Oklahoma City, for Defendant at Trial.

Robert H. Macy, District Attorney, Ray Elliott, Assistant District Attorney, Oklahoma County Courthouse, Oklahoma City, for the State at Trial.

Lee Ann Jones Peters, Capital Direct Appeals Division, Oklahoma Indigent Defense System, Norman, for Appellant on Appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, William L. Humes, Assistant Attorney General, Oklahoma City, for Respondent on Appeal.

## OPINION

CHAPEL, Vice Presiding Judge:

Wesley Wayne Williams was tried by a jury and convicted of Murder in the First Degree (Counts I and II) in violation of 21 O.S.1991, § 701.7(A), in the District Court of Oklahoma County, Case No. CF–93–6031. In Count I, the jury found Williams was previously convicted of a felony involving the use or threat of violence, knowingly created a great risk of death to more than one person, and probably would commit criminal acts of violence that would constitute a continuing threat to society. In accordance with the jury's recommendation, the Honorable Daniel Owens sentenced Williams to death on Count I and life imprisonment without the possibility of parole on Count II. Williams has perfected his appeal of this conviction and raises seventeen propositions of error. We are compelled to reverse and remand for a new trial. Consequently we address only Propositions I and II.

On October 2, 1993, Williams shot and killed Ronald Harris and Timothy McCain. Williams claimed self-defense. On October 1, Harris came to Williams's house to see Harris's sister, Sharon Roe, who, along with her son, was staying with Williams. The men argued and Williams ejected Harris from his property at gunpoint. Harris, Roe and her son went to a friend's house where Williams's friend Wesley Owens told Harris and Roe that Williams was a bad man who had killed his own father. Owens warned Harris and Roe to stay away from Williams. Harris complained about Williams all evening. He said Williams would not get away with pointing a gun at him and asked several people where he could find a gun. That night Owens warned Williams that Harris was trying to find a gun to kill him.

When Roe returned to Williams's house Williams was there with his former girlfriend, Karen Pontious. Roe testified she told Pontious that Owens accused Williams of killing his own father and that Williams said Roe and her brother would have to go. Pontious testified Williams did not hear the conversation and that she told Roe the story was not true. Williams denied threatening Roe or Harris over Owens's story.

The next day Williams and Roe were in the fenced yard when Harris and McCain arrived. Williams, who is disabled and walked with a cane, met McCain and Harris, who was on crutches, at the porch. Roe testified Williams unlocked and opened the gate, everyone went in the house, and Williams asked her to take her son upstairs so the three men could talk. As soon as Roe got upstairs she heard four shots. She ran downstairs, saw Harris and McCain dead, and asked Williams what he had done. At preliminary hearing Roe testified Williams said it was "them or me". At trial Roe testified Williams said he would kill Harris if Harris returned to the house. Roe did not see a weapon near either victim. Roe went upstairs again, heard a fifth shot, and heard Williams say, "He wasn't dead all the way."

Williams testified Harris and McCain drove in through the open gate and pushed their way into the house while Roe immediately went upstairs. Williams said when he entered, McCain pulled up a gun and Harris was holding the shotgun Williams kept by his door. When Williams saw McCain's .38 he drew his own .9 millimeter semi-automatic weapon and began shooting. Williams told Roe it was "them or me". He took McCain's .38 and the shotgun from Harris and packed them in the car.

Williams and Roe fled with her son to Corpus Christi, Texas. They spent the night, then decided to return to Oklahoma City. Their car broke down in Bellmead, Texas. Williams left the .9 millimeter near a dumpster at a local motel. Officers later found a .38 in a nearby field. Roe contacted a friend who alerted authorities; Williams was arrested and returned to Oklahoma.

We begin with the reversible error addressed in Proposition II. Williams claims the trial court violated his privilege against self-incrimination and infringed on his right to the assistance of counsel by ruling that he had to take the stand before presenting evidence of self-defense. Williams stated several times on the record that he did not intend to testify and would only do so because the trial court required him to take the stand in order to present self-defense. In the many rulings made on this issue, the trial court insisted that Williams was not required to take the stand but seemed convinced that, in order for Williams to claim self-defense, someone present at the crime had to testify as to Williams's state of mind. Whether intentional or not, the effect of the ruling was that Williams could not present any evidence of self-defense unless he first took the stand and personally claimed self-defense. The court noted that it could not force Williams to take the stand, but would not admit any foundational evidence of self-defense until Williams took the stand. The court emphasized its belief that it was Williams's choice to take the stand. Thus Williams was not allowed to develop any evidence which would support a theory of self-defense by cross-examining State witnesses. Before Williams opened his case, the trial court explicitly ruled that Williams had to take the stand before he could present any witnesses or evidence on the issue of self-defense. This order encompassed more than just evidence of the victim's reputation, threats or acts of violence against Williams; it included any statements or other evidence which would support a self-defense claim.

The trial court appears to have based this ruling on a belief that some direct evidence of Williams's state of mind was required. This is not the law of self-defense. This Court has held that a defendant may raise self-defense sufficiently to justify an instruction through circumstantial evidence alone.[1] In *Cordray* the defendant did not testify and the State did not introduce any confession, admission or hearsay statement made by the

1. *Cordray v. State,* 268 P.2d 316 (Okl.Cr.1954).

defendant regarding the crime.[2] Cordray announced a self-defense claim in opening statement, then relied on evidence developed in cross-examination of State witnesses suggesting the decedent had been the aggressor.[3] This Court held this circumstantial evidence alone sufficiently raised the issue of self-defense and required a jury instruction.[4] If the State may prove a defendant's state of mind through circumstantial evidence, then common sense dictates that a defendant may attempt to prove his state of mind through circumstantial evidence as well.[5] Here, Williams claimed self-defense in his opening statement but was denied even the opportunity to attempt to present a circumstantial case. Of course, as we discuss below, had all the evidence been properly admitted Williams would have been able to elicit or present both circumstantial and direct evidence (Roe's testimony that he claimed it was "them or me") regarding his state of mind without testifying himself.

■ Self-defense is an affirmative defense which must be raised by the defendant unless evidence in the State's case shows the homicide was justifiable.[6] Oklahoma law does not require a defendant to take the stand in order to claim self-defense.[7] This Court has recognized a defendant's ability to raise self-defense through cross-examination of State witnesses.[8] Williams was unable to conduct any questioning which would have elicited testimony raising the issue of self-defense in the State's case.

■ The effect of the trial court's ruling was to force Williams to testify when he had already stated that he did not wish to take the stand. In a directly analogous case the Supreme Court reversed a trial court where Tennessee law required a defendant to take the stand before presenting witnesses.[9] While *Brooks* arose from legislation passed to address witness sequestration problems, the Court's opinion turns on the idea that the requirement the defendant take the stand first or not at all limits his freedom in choosing to take the stand. Any focus on the sequestration issue goes merely to the historical necessity for the Tennessee rule, not the scope of the Court's opinion. The Court was concerned with the adverse effect on a defendant's freedom to choose if and when to testify and how to most effectively present his case to the jury. As in *Brooks*, Williams's constitutional right to not testify

**2.** *Cordray*, 268 P.2d at 318.

**3.** *Cordray*, 268 P.2d at 318–19.

**4.** *Cordray*, 268 P.2d at 319.

**5.** Other jurisdictions have addressed this explicitly. *People v. Hoskins*, 403 Mich. 95, 267 N.W.2d 417, 419 (1978) (defendant may prove state of mind circumstantially and any contrary ruling violates privilege against self-incrimination); *Dubose v. State*, 187 Ga.App. 293, 369 S.E.2d 924, 925–26 (1988) (defendant need not testify but may establish self-defense through other witnesses or circumstantial evidence).

**6.** *Holloway v. State*, 712 P.2d 68, 69 (Okl.Cr. 1986) (defendant's statements presented in State's case show deliberate killing).

**7.** *See, e.g., Bechtel v. State*, 840 P.2d 1, 6 (Okl.Cr. 1992); *Camron v. State*, 829 P.2d 47, 52 (Okl.Cr. 1992); *West v. State*, 798 P.2d 1083, 1085 (Okl. Cr.1990); *Holloway*, 712 P.2d at 69; *Broaddrick v. State*, 706 P.2d 534, 536 (Okl.Cr.1985); *Lumpkin v. State*, 683 P.2d 985, 987 (Okl.Cr.1984); *Neal v. State*, 597 P.2d 334, 337–38 (Okl.Cr. 1979); *Fowler v. State*, 507 P.2d 929, 931 (Okl. Cr.1973); *Harris v. State*, 400 P.2d 64, 70 (Okl. Cr.1965) (evidence of victim's reputation proper with plea of self-defense and "some other evidence" of self-defense); *Cordray*, 268 P.2d at 319; *Fields v. State*, 85 Okl.Cr. 439, 188 P.2d 231, 235 (1947) (evidence of victim's reputation); *see also Hogan v. State*, 877 P.2d 1157, 1164 (Okl.Cr.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1154, 130 L.Ed.2d 1111 (1995) (Chapel, J., dissent, noting trial court instructed on self-defense based on defendant's confession admitted during State's case-in-chief). In *Thompson v. State*, 365 P.2d 834 (Okl.Cr.1961) this Court held that, as the defendant was the only person who could testify to the victim's specific acts, the defendant must take the stand if those details were to be admitted. This narrow ruling focuses merely on the victim's acts and is distinguishable from the issue before this Court. At Williams's trial, the trial court and prosecutor cited a Montana case requiring a defendant to take the stand before raising self-defense. *State v. Logan*, 156 Mt. 48, 473 P.2d 833, 840–43 (1970). The State does not rely on this case on appeal, and it is incompatible with settled Oklahoma law.

**8.** *Neal*, 597 P.2d at 337–38; *Cordray*, 268 P.2d at 318–19.

**9.** *Brooks v. Tennessee*, 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972).

was violated when he was required to take the stand before he could present any witnesses or evidence of self-defense.

◼ A trial court cannot explicitly or effectively force a defendant to choose between his Sixth Amendment right to present a defense and his Fifth Amendment right not to testify. The Supreme Court, holding that a defendant cannot be forced to choose between asserting a Fourth Amendment claim and his Fifth Amendment right to silence, said such a choice was not voluntary and explained:

> A defendant is 'compelled' to testify in support of a motion to suppress only in the sense that if he refrains from testifying he will have to forego a benefit, and testimony is not always involuntary as a matter of law simply because it is given to obtain a benefit. However, the assumption which underlies this reasoning is that the defendant has a choice: he may refuse to testify and give up the benefit. When this assumption is applied to a situation in which the 'benefit' to be gained is that afforded by another provision of the Bill of Rights, an undeniable tension is created. Thus, in this case Garrett was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another.[10]

Here, Williams was "compelled" to testify in the sense that if he chose not to testify he lost the opportunity to present his self-defense claim. The trial court's ruling required Williams to surrender his Fifth Amendment right in order to assert his Sixth Amendment right.

◼ The State appears to agree that self-defense can be established through witnesses other than the defendant and argues that not enough other evidence was present to establish the defense without Williams's testimony. This argument begs the central issue

before the Court: Williams was required to testify before presenting any evidence of self-defense, so no such evidence could be present without Williams's testimony. The trial court commented that the only evidence of self-defense presented in the State's case was Roe's "them or me" testimony which would not itself justify a self-defense instruction. That testimony, which was not admitted, stands alone only because the trial court did not allow Williams to augment it. In cross-examination Williams could have elicited evidence that he said it was "them or me" along with accounts of the threats Harris made in Roe's presence and Harris's attempts to find a gun to kill Williams. This testimony could have laid a foundation sufficient to support Williams's other witnesses—almost all friends of Harris or McCain—who testified about Harris's actions, that Williams was warned about Harris, and that Harris continued to make threats against Williams on the morning of the crimes. A claim supported by this evidence would have warranted jury instructions on self-defense without Williams's own testimony.

◼ The State attempts to shift this Court's focus on review by insisting that Williams's evidence was not believable. That is not the point. Whether the evidence was believable is for the jury to decide, not the State or this Court. The question is whether the trial court required Williams to choose between his right to silence and his right to present a defense. Although the State does not address the issue, Williams was prejudiced by being compelled to take the stand against his express wishes. Because Williams was subject to impeachment by prior convictions the jury learned of his unflattering past criminal history. The State used this record against Williams in closing argument, emphasized Williams's testimony and said the jury's job was to decide whether Williams or Roe was telling the truth. As Williams's testimony preceded any other evidence supporting his self-defense claim, the jury may have discounted the other evidence he presented. Given the trial court's ruling,

**10.** *Simmons v. United States*, 390 U.S. 377, 393–94, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968)

(footnotes omitted).

counsel could not strategically place his witnesses so the first evidence of self-defense came from persons hostile to Williams.

Williams specifically did not wish to put his credibility at issue in this trial, and attempted to exercise his right not to testify. Nothing in Oklahoma law required him to take the stand before presenting any evidence at all of self-defense. The trial court required Williams to choose between his Fifth and Sixth Amendment rights. In addition to this insurmountable violation of his constitutional rights, Williams's forced testimony prejudiced him by (1) placing his credibility in issue, (2) allowing his prior felony convictions to be elicited, and (3) compelling him to fashion his defense on a pattern dictated by the trial court. This erroneous ruling requires reversal.

In Proposition I Williams argues the trial court's exclusion of evidence supporting Williams's defense deprived him of his constitutional rights to due process, to present a defense, and to confront witnesses against him. At preliminary hearing Roe testified that immediately after the shootings Williams told her he had to do it, it was either "them or me". The State filed a motion in limine to keep out all exculpatory statements of self-defense, arguing any out-of-court exculpatory statement would be self-serving and inadmissible.[11] During motion hearings the trial court held the matter in abeyance but ruled that Williams could not use this evidence during the State's case (see discussion of Proposition II above). After voir dire the trial court ruled this evidence was self-serving and would not be admitted at all. Williams made an offer of proof that Roe would say Williams told her it was self-defense within two or three seconds of the shots. Williams's repeated objections and offer of proof preserved this issue for appeal. Williams argues that the statement was admissible as 1) hearsay under one of the hearsay exceptions, 2) part of a confession, and 3) as a prior inconsistent statement to be used in impeachment. He also argues that his Sixth Amendment right to present a defense, questions of fairness, and due process required admission of this statement after Roe's other evidence was received.

Williams first claims the statement was admissible as an exception to the hearsay rule. Williams argues the question of admissibility does not end with the fact this statement was self-serving hearsay, because it could be admissible if it falls within one of the hearsay exceptions contained in 12 O.S. 1991, § 2803.[12] Williams correctly notes that § 2803 contains no exception barring otherwise admissible statements merely because they are self-serving.

▮ Williams claims that the statement was admissible as an excited utterance, as it related to an existing startling event and was made while Williams was under the stress of excitement caused by the event.[13] As self-serving statements are inherently untrustworthy, the latter requirement is particularly important; there must be no time for reflection or fabrication.[14] Whether a statement

---

**11.** The trial court also disallowed testimony about two phone calls Williams made some time after the crimes where he claimed self-defense. Williams contests only the ruling as to Roe.

**12.** *Phillips v. State*, 756 P.2d 604, 607 (Okl.Cr. 1988) (defendant's exculpatory hearsay statement admissible under firmly rooted hearsay exception or if defendant takes stand and is available for cross-examination). Under *Phillips*, Roe's testimony about the statement would have been admissible under the excited utterance exception during Williams's case after he testified and had undergone cross-examination. None of the State's cited cases indicate or hold that a statement is inadmissible merely because it is self-serving, and *Harris v. State*, 448 P.2d 296 (Okl. Cr.1968), is not relevant on this issue at all. The State's analogy to *Hooks v. State*, 862 P.2d 1273 (Okl.Cr.), *cert. denied*, ── U.S. ──, 114 S.Ct.

1870, 128 L.Ed.2d 490 (1993), is similarly flawed since *Hooks* was decided wholly under § 2804(B)(1), not under any § 2803 exception, and did not hold anything about the admissibility of self-serving hearsay per se. The trial court relied on *Hooks* and *West v. State*, 798 P.2d 1083 (Okl.Cr.1990), which is also irrelevant since it relies on § 2804(B)(5), the residual exception to the hearsay clause, and has nothing to offer on the issue of self-serving hearsay admissible under any firmly rooted exception.

**13.** *Marquez v. State*, 890 P.2d 980, 983 (Okl.Cr. 1995).

**14.** *Marquez*, 890 P.2d at 983 (witness statements were made spontaneously upon waking the morning after crime and there was no time for reflection); *McCalip v. State*, 778 P.2d 488 (Okl.

qualifies as an excited utterance depends not on a fixed time but on the facts and circumstances of each case—the words should be one continuing transaction with the event.[15] If the foundational requirements are met, a statement need not have independent indicia of reliability to qualify as an excited utterance.[16] As Williams argues, shooting and killing two men certainly qualifies as a startling event, the statement relates to that event since it explains the shooting, and it was made within seconds of the shots.

Williams also claims that the statement was admissible as a present sense impression, since he perceived a startling event and gave a virtually contemporaneous explanation for the event. In addition, he argues the statement was admissible as a declaration of existing state of mind. This exception applies where the statement is offered, as here, to prove a state of mind at issue (malice) and the statement relates to a then existing state of mind (Williams said the victims were going to kill him). No precedent is analogous to the facts of this case.[17] Williams's statement appears to. fit within at least the excited utterance and present sense impression exceptions.

■ The State argues that the trial court specifically found the "them or me" statement did not fall under one of the claimed exceptions to the hearsay rule. This assertion is not supported by the record. Neither the trial court's explicit ruling (that the statement was self-serving) nor the cases it relied on suggest that the trial court considered whether the evidence was admissible under any of the exceptions above. Thus this Court cannot review the ruling under the hearsay exceptions for an abuse of discretion; the trial court did not exercise its discretion in making a ruling on the issue.

The State concedes that "if the killings occurred as Defendant described ... the statement at issue might be the result of a startling event"[18] and argues that the evidence does not support Williams's self-defense claim. The State also agrees that the statement was virtually contemporaneous with the crime and argues that contemporaneity should be disregarded in this case.[19] The State's argument seems to be based on the theory that since the State does not believe Williams's statement or claim of self-defense, the statement is not admissible. When the trial court made its ruling, no evidence had as yet been submitted, and even if it had the trial court is not the finder of fact. The issue in determining the admissibility of this statement under the hearsay exceptions is not whether evidence supported the truth of the statement. The issue is whether the statement meets the requirements for admissibility under any given exception. If the statement meets these foundational requirements then it should be given to the jury. If the trial court were to impose other requirements after determining a statement falls within a hearsay exception, then the trial court would be improperly

Cr.1989) (victim's statement made when questioned morning after crime, was not evidence that the witness was still excited); *Hawkins v. State*, 761 P.2d 918, 920 (Okl.Cr.1988) (victim's statement made within ten minutes after calling for help was made under influence of startling event); *Griffith v. State*, 734 P.2d 303, 305 (Okl. Cr.1987) (victim's statement shortly after shooting that defendant killed unarmed second victim was made under influence of startling event); *Beavers v. State*, 709 P.2d 702, 704 (Okl.Cr.1985) (no fixed rule as to time and distance from the exciting event, victim statements made night of crime were admissible but statements next day after questioning were no longer under influence of event).

15. *Beavers*, 709 P.2d at 704.

16. *Smallwood v. State*, 907 P.2d 217, 226, n. 11 (Okl.Cr.1995); *Griffith*, 734 P.2d at 305, n. 1.

17. *Sellers v. State*, 809 P.2d 676, 683–84 (Okl. Cr.), *cert. denied*, 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991), held that a non-contemporaneous statement "I couldn't do it" was specifically excluded from the exception as a statement of memory or belief offered to prove its truth. This is distinguishable from Williams's contemporaneous statement at issue, which was not a statement of belief regarding his own capabilities. The State relies on *Phillips*, 756 P.2d at 607, which is irrelevant to this issue as it addresses only statements of a then existing bodily condition, not state of mind.

18. Appellee's Brief at 8.

19. Appellee's Brief at 10.

usurping the jury's fact-finding function. The trial court is the judge of the law, while the jury determines the facts of the case based on admissible evidence.[20] If this statement was admissible under a hearsay exception then the jury should have heard it. It was up to the jury to determine whether the statement was credible based on subsequently presented evidence.

 Williams next claims that the statement was admissible as part and parcel of his admission or confession. At trial Roe testified for the first time that, after the shootings, Williams told her he had said if Harris came back he'd kill him. The trial court would not allow Roe to repeat the "them or me" statement, but she agreed on cross-examination that Williams had made another statement as well. Williams argues that this second "I told you" response, coupled with Roe's preliminary hearing "them or me" testimony, equals a confession or admission, which should not be admitted piecemeal. The whole of a defendant's statements which are made in the same confession or conversation should be admitted, including a self-serving statement which relates in time and matter to the confession and is trustworthy enough to be admissible under the hearsay exceptions.[21] A defendant lacks a meaningful opportunity to be heard where the State may exclude competent, reliable exculpatory evidence bearing on the credibility of a confession when that evidence is central to a defendant's claim of innocence.[22] Williams argues these statements 1) were made in the same conversation and 2) admitted killing two people. The statements appear admissible under the excited utterance or present sense exceptions. The State does not dispute the settled law of *Crawford* and

*Williams* but claims that the statements, while possibly damaging admissions, did not equal a confession. The principles of law set forth in *Crawford* and *Williams* are not confined to confessions alone but apply to damaging admissions as well. The State's argument does not explain why two damaging contemporaneous statements relating to the same event, both of which admit killing two people, made in the same conversation to the same person, should not both be admissible under *Williams*. After Roe testified about the "I told you" response, the "them or me" statement should have been admitted.

 Williams also claims "them or me" should have been admitted as a prior inconsistent statement to impeach Roe. At trial, after Roe testified about Williams's "I told you" statement, Williams argued that the "them or me" testimony should be admissible as a prior inconsistent statement used for impeachment. A prior inconsistent statement is admissible to impeach credibility even where that statement would not be admissible in the State's case-in-chief.[23] For impeachment, the prior statement need not be shown to the witness at the time of questioning, but on request shall be shown to opposing counsel before cross-examination; extrinsic evidence is only admissible if the witness has an opportunity to explain or deny it and the opposing party can question the witness about the evidence.[24] In *Grayson v. State*[25] this Court held there had been no prior evidence on the issue, and thus there was no prior inconsistent statement to use for impeachment. The witness in *Grayson* was not asked about the defendant's statements at preliminary hearing but testified at trial that the defendant made a statement

**20.** 22 O.S.1991, § 834.

**21.** *Williams v. State*, 542 P.2d 554, 573 (Okl.Cr. 1975), *modified*, 428 U.S. 907, 96 S.Ct. 3218, 49 L.Ed.2d 1215 (1976); *see also Crawford v. State*, 840 P.2d 627, 633 (Okl.Cr.1992) (it was error to exclude tape of self-serving declarations made about 24 hours before confession where issues on tape were related to confession). The State's cited cases are irrelevant to this issue, as they do not deal with confessions. *Stanberry v. State*, 637 P.2d 892 (Okl.Cr.1981), does not even concern a defendant's statement.

**22.** *Crane v. Kentucky*, 476 U.S. 683, 686–87, 106 S.Ct. 2142, 2146–47, 90 L.Ed.2d 636 (1986) (evidence going to a confession's voluntariness may also be admissible on issue of credibility).

**23.** *Bennett v. State*, 652 P.2d 1237, 1240 (Okl.Cr. 1982) (defendant's statements in second trial impeached with prior inconsistent statements made in the first trial).

**24.** 12 O.S.1991, § 2613.

**25.** 747 P.2d 971, 974 (Okl.Cr.1987).

against the victim. The State argues this situation is *Grayson* in reverse since Roe was not asked about the "them or me" statement at trial. This makes no sense. The point of *Grayson* was that there was no prior evidence on the issue and no opportunity for a prior statement to have been made. Here all parties agree there was a prior statement at preliminary hearing which was opposite to Roe's trial testimony. Under *Grayson,* the statement should have been admitted for impeachment purposes.[26]

 Williams claims this ruling affected his rights to present a defense, to fairness and to due process. Williams argues he was deprived of a fair trial because the jury heard only half of a statement the State never denied Roe said Williams made. Where hearsay evidence is highly relevant to a critical issue in the case, and substantial reasons exist to assume the evidence is reliable, then the hearsay rule should not be used mechanically to defeat the ends of justice.[27] By ruling that the statement was inadmissible simply because it was self-serving hearsay the trial court deprived Williams of the opportunity to present evidence which was highly relevant to his defense; indeed, the statement provided the most credible direct evidence of self-defense Williams could offer.

 Williams was prejudiced by omission of the "them or me" statement. The State relies on *Crawford*[28] to argue that Williams was not prejudiced since he had the opportunity to subject the State's case to "adversarial testing". However, in *Crawford* the defense was that the victim was alive when the defendant left and his statements denied all knowledge of the victim or the crimes involved. Here, Williams claimed self-defense and his suppressed statement was a claim of self-defense to a hostile party made immediately after the crime. Although Williams himself testified to the "them or me" statement, as the State notes, the jury evidently didn't believe him. In closing argument, the prosecutor emphasized that this case came down to credibility and repeatedly asked the jury whether they were going to believe Williams or Roe. That equation might have been less clear-cut if the jury knew Roe, a hostile witness, had testified that immediately after the killings Williams said it was "them or me". Had the statement been admitted in the State's case-in-chief Williams could have argued self-defense without taking the stand (see Proposition II above). In any event the "them or me" testimony should have been admitted under *Phillips* and *Grayson* after Williams took the stand and was cross-examined about his version of the statement. The testimony could have added credibility to Williams's claim and countered the State's argument that self-defense was a recent fabrication.

In summary, Roe's testimony that Williams said it was "them or me" almost contemporaneously with the killings was admissible as either an excited utterance or a present sense impression. After Roe testified about a different contemporaneous statement by Williams, the "them or me" statement was admissible as a prior inconsistent statement for impeachment. After the "I told you" portion of Williams's statement was admitted, the "them or me" portion, though exculpatory, should have been admitted as part of that entire statement. Williams's rights to due process and a fair trial were harmed by his inability to present evidence highly relevant to a critical issue in the case. Williams was prejudiced by exclusion of the statement. The State's arguments otherwise boil down to a defense of the successful trial strategy which prevented anyone other than Williams from repeating any exculpatory statements by Williams claiming self-defense. This strategy ensured that Williams was prevented from presenting otherwise reliable and relevant evidence simply because it

---

**26.** Williams claims he was deprived of his Sixth Amendment right to confront witnesses and a fair trial as a result of this inability to impeach by prior inconsistent statement. The right to effective cross-examination, especially by impeachment to show bias, is protected by the Sixth Amendment. *Livingston,* 907 P.2d 1088, 1092–93 (Okl.Cr.1995); *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

**27.** *Green v. Georgia,* 442 U.S. 95, 99, 99 S.Ct. 2150, 2151–52, 60 L.Ed.2d 738 (1979).

**28.** 840 P.2d at 634.

would help his case. The "them or me" statement should have been admitted. Standing alone this error might not be reversible, but combined with the error discussed in Proposition II, this error requires reversal.

As a result of the errors identified in the guilt/innocence stage of the trial this case is **REVERSED** and **REMANDED** for **NEW TRIAL.**

STRUBHAR, J., concurs.

JOHNSON, P.J., specially concurs.

LUMPKIN and LANE, JJ., concur in results.

JOHNSON, Presiding Judge, specially concurring.

I concur in the Court's decision herein to reverse and remand the case for a new trial but I need to specially concur as it relates to such case. It should be made certain that a jury instruction of self-defense can only be made in a case where one of two things occur. The first would be under the general type of case where a defendant takes the stand and testifies as to the self-defense issue. This, quite frankly, is the easiest of the two.

The second would be where there is direct or circumstantial evidence that would allow an instruction of self-defense even though the defendant does not take the stand. This would be in that unusual case where there is clear and convincing evidence of self-defense. In those cases, the court should give the self-defense instruction. This would allow a defendant to preserve their Fifth Amendment right.

LUMPKIN, Judge, concurring in results.

I concur in the Court's decision to reverse and remand the case for a new trial due to the trial court's denial of Appellant's right to examine Sharon Roe about his statement made immediately after the shooting that "it was them or me". However, I disagree with the Court's analysis on when the defense of self-defense can be raised and what evidence can be used to raise the defense.

In order to warrant a jury instruction on self-defense, a defendant must show that he or she had a reasonable belief at the time of the killing that he or she was in imminent danger of great bodily harm or death. *Bechtel v. State,* 840 P.2d 1, 6 (Okl.Cr.1992). This can be proven by evidence of the events occurring immediately prior to and during the fatal altercation. *Thompson v. State,* 365 P.2d 834, 837 (Okl.Cr.1961). This evidence includes testimony of witnesses to the fatal altercation regarding the defendant's conduct and state of mind and physical evidence of the altercation. This type of evidence can be brought out through direct or circumstantial evidence, in the defense case-in-chief or through cross-examination of the State's witnesses. However, if the defendant is the only person who can testify to the events occurring immediately prior to and during the fatal altercation, the defendant must testify in order to raise the defense of self-defense. *Id.*

The Court distinguishes *Thompson* from the present case in Footnote 7. However, I find it is directly on point. In *Thompson,* only the defendant and the victim were witnesses to the fatal shooting. This Court held that once the defendant testified to the events occurring immediately prior to and during the fatal altercation, she had sufficiently raised the defense of self-defense and could then present evidence of acts of violence against her by the deceased prior to the homicide.

In the present case, Appellant and the victims were the only witnesses to the crime and therefore the only people who could testify to the events occurring immediately prior to and during the fatal altercation. As the victims were dead, Appellant was the only person who could so testify. Therefore, Appellant could only establish his defense of self-defense by taking the stand and testifying. As Appellant did not want to testify, he had no evidence of self-defense to warrant giving a jury instruction on the issue. If a defendant fails to testify and he is the only one who can provide sufficient, admissible evidence to raise the defense of self-defense, then he fails to testify at his own peril and

runs the risk of failing to sufficiently raise the defense.

The opinion also relies on evidence of threats on Appellant's life made by the victims to persons other than Appellant. This evidence is not relevant in establishing the defense of self-defense. Only overt acts, gestures or words spoken by the deceased and communicated to the defendant immediately prior to or during the fatal altercation are relevant in establishing the fear which would form a reasonable ground for the belief that the defendant is about to suffer death or great bodily harm. *See West v. State,* 617 P.2d 1362, 1366 (Okl.Cr.1980).

Here, the trial court did not order Appellant to testify but did require him to present evidence of self-defense in order to claim the defense of self-defense. Absent Appellant's testimony, the evidence was insufficient to raise that defense. There were no prior threats by the deceased on Appellant's life communicated to Appellant nor any evidence that the victims were the aggressors. If the victims did commit an overt act which would have provided the basis for the defense of self-defense, the Appellant was the only witness to that act. However, the evidence of the actions of the victims and Appellant immediately prior to the shooting, as related by Sharon Roe, only support a finding of a cold-blooded killing. The only error in this case was a denial of the right of confrontation in the denial of Appellant's right to fully cross-examine Sharon Roe.

LANE, Judge, concurring in results.

I join Judge Lumpkin in his special vote in this matter. In addition I would find that *Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972) has no application to Oklahoma. It is authority for the premise that it would be unconstitutional to require a defendant to testify before he can present evidence. *Brooks* can be distinguished from the present case from a factual standpoint. In *Brooks,* Tennessee required a defendant to testify first in his case in chief if the rule as to sequestration of witnesses had been invoked. If he did not testify first he could not testify at all, because he would have violated the rule by being present in the court room when his other witnesses testified. Oklahoma has never extended its rule on sequestration that far. I would limit *Brooks* to its facts and find that it has no application to Oklahoma.