2005 OK CR 15

**James Lawrence MITCHELL, III, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D2003–248.**

Court of Criminal Appeals of Oklahoma.

Sept. 14, 2005.

Connie Pope, James Siderias, Asst. District Attorneys, Oklahoma City, OK, Attorneys for the State at trial.

John B. Albert, Oklahoma City, OK, Attorney for the Defendant at trial.

James H. Lockard, Deputy Division Chief, Michael Morehead, Appellate Defense Counsel, Norman, OK, Attorney for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Robert Whitaker, Assistant Attorney General, Oklahoma City, OK, Attorneys for State on appeal.

## OPINION

C. JOHNSON, Judge:

¶1 Appellant, James Lawrence Mitchell, III., was convicted by a jury in Oklahoma County District Court, Case No. CF 2000–4712, of First Degree Murder (Child Abuse), in violation of 21 O.S.Supp.2000, § 701.7(C) (Count 1), Child Abuse, in violation of 10 O.S.Supp.1999, § 7115 (Count 3), and Child Sexual Abuse, in violation of 10 O.S.Supp. 1999, § 7115 (Count 4), after former conviction of two felonies.[1] Jury trial was held on January 27, 2003, through February 7, 2003, before the Honorable Virgil Black, District Judge. On Count 1, the jury found the existence of three aggravating circumstances: (1) the defendant was previously convicted of a felony involving the use or threat of violence;[2] (2) the murder was especially heinous, atrocious, or cruel;[3] and, (3) the defendant poses a continuing threat to society.[4] The jury set punishment at death on Count 1, and at one thousand (1,000) years each on Counts 3 and 4. Mitchell was sentenced in accordance with the jury's verdicts on March 4, 2003.[5] He then filed this appeal.

¶2 Shawanda Rogers, Charita and Kyree's mother, moved to Oklahoma City with Michael Frerene in the latter part of 1998. In the spring of 2000, Frerene returned to Louisiana for a couple of months. During that time, Rogers worked at McDonalds where she met Appellant—James Mitchell. In July 2000, Rogers, Charita and Kyree moved in with Mitchell.

¶3 Around 8:00 a.m. on July 23, 2000, Mitchell drove Rogers to work at the Fifth Seasons Hotel. Charita and Kyree stayed at

---

1. Shawanda Rogers was also convicted in Case No. CF 2000–4712 of First Degree Murder (Permitting Child Abuse) and Child Abuse. She was tried separately and was sentenced to life imprisonment on each offense. Her convictions and sentences were affirmed on direct appeal. *Rogers v. State*, F 2002–279 (Okl.Cr. July 16, 2003)(not for publication).

2. 21 O.S.1991, § 701.12(1)

3. 21 O.S.1991, § 701.12(4)

4. 21 O.S.1991, § 701.12(7)

5. Judge Black ordered the sentences be served consecutively.

home with Mitchell while Rogers was at work. As early as 8:15 a.m., Mitchell began calling the hotel. Initially, he told a co-worker it was important for Rogers to call home. In the third or fourth call, Mitchell said Rogers' baby was sick and she needed to call home. The fifth or sixth time Mitchell called, he said Rogers needed to come home because her baby was having a seizure. A co-worker told Mitchell to take the baby to the hospital. Mitchell continued to make phone calls to Rogers' place of employment and with each call he sounded more excited. Even though Rogers' co-workers repeatedly told her she needed to go home and check on her baby, she did not leave until she had completed her shift. Mitchell picked her up from work between 2:30 and 3:30 p.m.

¶ 4 After Rogers and Mitchell returned home, Rogers called her aunt Gwen Alexander and asked for a ride to the hospital. Her uncle Kevin Hopson and Michael Frerene then drove to Mitchell's house, picked up Rogers, Charita and Kyree, and took them to Children's Hospital.

¶ 5 When they arrived at the Children's Hospital Emergency Room at 4:20 p.m., "she [Charita] was obtunded and essentially comatose." Charita was in respiratory failure and was having seizures. Her Glascow Score was four, but she was still breathing on her own. Charita had widespread bruising from head to toe. She had areas of denuded skin on her buttocks, hands and fingers. Some of the bruised areas and marks on her body were in the form of a loop. She also had two areas resembling bite marks and retinal hemorrhages.

¶ 6 A CT scan of her head showed bleeding in her brain; it showed blood tracking in the area separating the upper part of the brain from the area that controls balance. There was blood along the falx—the fibrous portion between the right and left part of the brain. Massive swelling of the left side of her brain was pushing her brain over the falx and causing herniation of the brain stem. These multiple significant brain hemorrhages suggested that Charita had suffered "more than one strike injury to her head." The injuries suggested Charita was shaken and struck; her head was hit against something or some-

thing was used to strike her head. The CT scan of Charita's abdomen showed swelling around her liver, possible injury to her spleen and pancreas, and bleeding in her left kidney.

¶ 7 Charita's bruises continued to evolve while she was in the Emergency Room which indicated to medical personnel that her injuries were relatively acute and probably occurred within one (1) to six (6) hours of presentation to the hospital. After the abdominal CT scan, Charita stopped breathing on her own and was taken to the pediatric intensive care unit (PICU). By the time she arrived in PICU, she had no evidence of brain or brain stem function. She was pronounced dead the following day, July 24, 2000, about 3:30 p.m.

¶ 8 Dr. Gessouroun, the PICU physician who examined Charita on July 24th, testified her internal injuries and lung injuries were caused by external trauma. He said the injuries to her lungs, pancreas and liver would have required blunt force trauma to her chest and abdomen. In the absence of a high speed car accident, her injuries would have required several different impacts. Noting the patterned bruises and the multiple areas of bleeding in her brain, Dr. Gessouroun testified it was very unusual to have bleeding in the brain's fourth ventricle in the absence of very extreme force. He said she had such massive trauma to her head that he would not have expected her to have a lucent period of normal or near normal level of functioning between the time of the lethal injury and the time she would have developed symptoms of brain injury. He said she was likely unconscious immediately or almost immediately and would not have been able to talk, eat, or play. Dr. Gessouroun testified he believed her injuries were inflicted the morning of July 23rd, at a time consistent with 11:00 a.m., when she was first reported to have started having seizures. Dr. Gessouroun believed she died from child abuse.

¶ 9 A sexual abuse examination was performed on Charita. A physician's assistant reported Charita had bruising on the bilateral labia majora and a loss of hymenal tissue between the 5:30 and 7 o'clock position. She testified the thinness of the hymenal tissue

suggested multiple incidents of penetrating trauma, with one incident possibly occurring within the last one to three days.

¶ 10 Because of Charita's severe injuries, Kyree was also examined. He told Dr. Keri Casas that he was not hurt or in pain, but she saw looped or horseshoe like bruises on his right arm, thigh, buttocks and upper back. She suspected the bruises were consistent with child abuse. She admitted the bruises could be within one day to one month old and stated the injuries were not life-threatening.

¶ 11 Mitchell voluntarily spoke with Oklahoma City Detective Willie Edwards on July 25, 2000. Detective Edwards testified Mitchell initially did not admit he was responsible for any injuries to Charita or Kyree. He blamed Shawanda for the abuse. He said Shawanda hit Charita on the head with a telephone on July 22nd and said Kyree stuck Charita's fingers in the fan. Detective Edwards said Mitchell's story changed during the interview. Mitchell said he heard Charita fall off the bed after he returned from taking Shawanda to work. Then he said he spanked Charita with a belt because she and Kyree were fighting. Finally, Mitchell said he lost control and he had blackouts.

¶ 12 Mitchell told Detective Edwards Charita started having seizures around 10:00 to 10:30 a.m. He said Charita was playing with Kyree before that time. Detective Edwards testified he knew that Charita's severe brain injuries would have rendered her unable to play, so he believed 10:00 to 10:30 a.m. was probably when the fatal injuries occurred. Mitchell also told Detective Edwards that Charita had been "messed with." Detective Edwards testified that Mitchell would not have known the results of the sexual assault examination when he said that.

¶ 13 Other relevant facts will be discussed as necessary under the various propositions of error.

¶ 14 In Proposition One, Mitchell claims his trial was infected with inadmissible hearsay, depriving him of his right to confrontation and cross-examination, in violation of the Sixth Amendment to the United States Constitution and Article 2, § 20 of the Oklahoma Constitution. Mitchell complains that (1) Detective Edwards was allowed to testify that Kyree Rogers told him Appellant picked Charita up by the ankles and slammed her head into the ground numerous times; (2) Sharronda Rogers was allowed to testify Shawanda Rogers said Appellant had beaten Charita; and (3) Michael Frerene was allowed to testify that Shawanda said Appellant said he did not want to take Charita to the hospital when she started having seizures.

¶ 15 In both state and federal criminal prosecutions, an accused has a right "to be confronted with the witnesses against him." *See* U.S. Const. amends. VI and XIV; Okla. Const. art. 2, § 20; *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The Confrontation Clause ensures "the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990). The clause "bars admission of some evidence which would otherwise be admissible under an exception to the hearsay rule." *Idaho v. Wright,* 497 U.S. 805, 814, 110 S.Ct. 3139, 3146, 111 L.Ed.2d 638 (1990) (citations omitted).

¶ 16 The confrontation clause requires that testimonial hearsay statements may be admitted as evidence against an accused at a criminal trial only when the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the declarant. *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 1369–1374, 158 L.Ed.2d 177 (2004). Although the Supreme Court has not explicitly defined the term "testimonial," in *Crawford* the Court discussed three types of "testimonial" statements: *ex parte* in-court testimony, extrajudicial statements contained in formalized testimonial materials, and statements made under circumstances which would lead an objective witness to reasonably believe that such statement would be available for use at a later trial. *Id.,* 124 S.Ct. at 1364. "Whatever else the term [testimonial] covers, it applies *at a mini-*

*mum* to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.,* 124 S.Ct. at 1374 (emphasis added). After distinguishing testimonial from non-testimonial hearsay, the Supreme Court noted non-testimonial hearsay might still be admissible against an accused in a criminal trial if the declarant were unavailable and the statement bore an adequate indicia of reliability. *Id.*

¶ 17 Mitchell submits that his right of confrontation was violated in each instance where the trial court admitted inadmissible hearsay. Appellant claims that Kyree's statements were testimonial in nature, argues Shawanda's statement might be testimonial in nature, and submits the double hearsay was not testimonial but did not contain sufficient guarantees of trustworthiness to permit its admission absent cross-examination. Appellant argues these errors warrant reversal of his convictions and sentences and remand for a new trial.

1. *Kyree's statement to Detective Edwards that Mitchell held Charita by the ankles and slammed her head into the ground numerous times.*

¶ 18 About 8:30 p.m. on July 23, 2000, Detective Edwards interviewed Kyree at Children's Hospital. Kyree had been in the Emergency Room family waiting area with his mother and other adults since 4:20 p.m. Detective Edwards described the interview as very brief and controlled and described Kyree as "very hyper. He was, you know, kind of off the walls a little bit, excited, just kind of jittery and nervous, and he appeared, you know, to be upset .... he is going 90 to nothing through that ER."

¶ 19 Detective Edwards said "I talked a little bit about his life and what was going on and why he was at the hospital. He said his sister was hurt. I asked who hurt his sister, and he said, "I pushed my sister down the stairs."" Detective Edwards asked Kyree if he saw anyone else hurt his sister and Kyree said James whipped her with a belt. Detec-

tive Edwards asked if James hit Charita with an open hand or fist and Kyree "demonstrated" an open hand. Detective Edwards testified he asked Kyree if anything else happened with his sister and James. Detective Edwards said Kyree said "He would hit the baby in the head with his hand and would pick the baby up by her ... feet and throw her on the floor. A bunch of times he did that."

¶ 20 Initially, the State sought admission of Kyree's statement pursuant to 12 O.S.Supp. 2000, § 2803.1, but upon objection, the trial court ruled the statute was inapplicable to Kyree's statement to Detective Edwards. The prosecutor then sought to admit his statements as excited utterances. Defense counsel objected and the trial court reserved ruling.

¶ 21 When Detective Edwards testified, the State elicited the testimony about Kyree's demeanor to lay the foundation for admission of his statement as an excited utterance. When defense counsel objected, the trial court noted Kyree was present at trial so the testimony would not pose a confrontation problem. Defense counsel then argued the detective's testimony was unnecessary and constituted stacking testimony. The State offered then to "wait" until after Kyree testified.[6]

¶ 22 Kyree, seven years old at the time of trial, then testified. Although he testified Appellant spanked him and Charita with a belt and fly-swatter, he said he did not recall Appellant spanking them with anything else. He testified he was not there the day Charita died. He said Charita cried "[a]bout James whipping her and me." The State then attempted to elicit testimony from Kyree relating to his statement to Detective Edwards:

Prosecutor: Did you ever see James grab her anyplace around her body?

Kyree: No.

Prosecutor: Did he ever grab her by her arms?

Kyree: No.

harmless error anyway."

---

6. The State argued Kyree's statement should come in because it would "only be reviewed for

. . .

Prosecutor: Okay. Did you ever see James grab her around the middle?

Kyree: No.

Prosecutor: Did you ever see James grab her around the ankles?

Kyree: No.

Prosecutor: Okay. Did he ever pick her up?

Kyree: No.

Prosecutor: Okay. Did you tell me that he picked her up by her ankles?

Kyree: No.

Prosecutor: Did you tell a police officer—

Kyree: No.

Prosecutor: —that he picked her up by her ankles?

Kyree: No.

¶ 23 Because Kyree did not testify he saw Mitchell pick Charita up by the ankles and slam her head into the ground, the trial court admitted Kyree's last statement to Detective Edwards under the residual exception to the hearsay rule. 12 O.S.Supp.2002, § 2804.1. The trial court found the statement admissible because of "exceptional circumstances;" "[i]t is obviously a statement of fact of consequence;" "the statement is more probative on the point for which it is offered than any other evidence that the State can procure through reasonable efforts," and "[t]he general purposes of the code have been met. The interests of justice will be best served by admission of evidence into this case because it involves the death of a small child and evidence of the perpretrator (sic) of this death." The trial court stated Kyree's statement "has an indicia of reliability and it's substantial," noting the statement was "in effect an excited utterance made to the detective . . . The little boy couldn't testify in here . . . The medical testimony is consistent with this testimony. He said this a number of times."

¶ 24 The prosecutor added she believed Kyree's statement was admissible as an excited utterance and said the State wanted to use it as substantive evidence to prove the truth of the matter asserted because it "is the only evidence of the mechanism of death of this child." The State argued Kyree was the only eyewitness; he related the statement without prompting to Detective Edwards and to a DHS worker; nothing indicates it was fabricated; the statement was made before Charita's autopsy and no one could have known the cause of death to coach Kyree on how it happened. The State argued it was the best evidence and was reliable. Although defense counsel continued to object that Kyree's statement was not admissible as an excited utterance or admissible under the residual hearsay exception, the trial court overruled the objections and admitted the statement to Detective Edwards under the residual hearsay exception. 12 O.S.Supp.2002, § 2804.1.

¶ 25 On appeal, Mitchell continues to claim admission of Kyree's statement to Detective Edwards—that Mitchell "would hit the baby In the head with his hand and would pick the baby up by her feet and throw her on the floor. A bunch of times he did that"—under the residual exception to the hearsay rule was error. Mitchell argues Kyree's statement was not an excited utterance, was "testimonial" in nature, and did not bear particularized guarantees of trustworthiness sufficient to support its admission under the exceptional circumstances set forth under Section 2804.1.

¶ 26 Section 2803(2) of Title 12 provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the startling event or condition" is not excluded by the hearsay rule regardless of the availability of the declarant. The excited utterance exception is a firmly rooted exception to the hearsay rule. *Slaughter v. State,* 1997 OK CR 78, ¶ 35, 950 P.2d 839, 852, *cert. denied,* 525 U.S. 886, 119 S.Ct. 199, 142 L.Ed.2d 163 (1998). Statements properly admitted under this exception do not violate the confrontation clause, because these types of "out-of-court declarations are made in contexts that provide substantial guarantees of trustworthiness." *White v. Illinois,* 502 U.S. 346, 355, 112 S.Ct. 736, 742, 116 L.Ed.2d 848 (1992). "A statement that has been offered in a moment of excitement—without the opportunity to reflect on the

consequences of one's exclamation—may justifiably carry more weight with a trier of fact than a similar statement offered in the relative calm of the courtroom." *Id.,* 502 U.S. at 356, 112 S.Ct. at 742–743.

¶ 27 For a statement to be admitted as an excited utterance, three foundational requirements must be met: *First,* there must be a startling event or condition; *Second,* there must be a statement relating to that startling event or condition; and *Third,* the statement must be made while the declarant is under the stress of excitement by the startling event or condition. *Slaughter, id.,* 1997 OK CR 78, ¶ 36, 950 P.2d at 852. "Whether a statement qualifies as an excited utterance depends not on a fixed time but on the facts and circumstances of each case." *Williams v. State,* 1996 OK CR 16, ¶ 17, 915 P.2d 371, 379.

¶ 28 Kyree's statement to Detective Edwards was not admissible as an excited utterance. Kyree did not blurt out accusatory statements upon seeing a police officer or upon seeing someone other than a family member. Kyree had been around several adult family members, besides his mother and Mitchell, for at least four hours without making any such statement.[7] Detective Edwards was experienced in, and had training, interviewing children. He asked Kyree "direct" questions designed to elicit a statement from Kyree. Although he said Kyree was "very spontaneous and voluntary at the point of his statements," all of Kyree's statements were in direct response to Detective Edwards' questions.[8] Detective Edwards admitted he "talked a little bit about his [Kyree's] life and what was going on and why he was at the hospital" and admitted he did not conduct a "full forensic interview" as he normally would.

¶ 29 In *Paxton v. Ward,* 199 F.3d 1197 (10th Cir.1999), the Tenth Circuit, reviewing a federal district court's ruling that this Court's determination that the trial court did not err in admitting the hearsay statement of a three year old as an excited utterance, noted:

> several hours passed between that event and the making of the statement. The evidence does not reveal anything about Pamela's activities or state of mind during that intervening period. We simply do not know whether she was present when the shooting was discussed, what form that discussion took, what if anything she was told about it, whether she was continuously upset, or whether she fell asleep. Any number of intervening events could have occurred that would have influenced or indeed brought about the statement at issue, such as speculation by the adults that her dad had shot her mom. And while it is true that Pamela was crying when the statement was made, there is no evidence that she had been crying or was upset during the entire period up to that time or whether something she overheard caused her to be upset. In addition, her statement was not spontaneously volunteered, but rather was offered in response to questioning . . .

*Id.,* 199 F.3d at 1211. The Tenth Circuit held the admission of the child's statement violated Paxton's right of confrontation.

¶ 30 Detective Edwards' testimony shows he was interviewing a potential witness to a criminal prosecution and the basis of his conversation with Kyree was to find out what happened to Charita. That a hyperactive four year old, stuck in an Emergency Room waiting room for over four hours, responded to his questions does not render his words spontaneous, excited utterances. During

---

7. Kevin Hopson, Kyree's mother's uncle who drove them to the hospital, did not testify Kyree made any statements about what happened to his sister. Sharronda Rogers, Kyree's aunt, came to the hospital and Kyree did not make any statements to her. Charita's father, Michael Frerene, also rode to the hospital with Kyree, Shawanda and Charita. He testified Kyree "acted like he didn't know what was going on," but he did not say Kyree made any statements.

8. Detective Edwards testified he tried to get Kyree to calm down and sit in a chair before the interview, and then began his interview by starting "out with, again, a little rapport.... You want to try and get a little bit of rapport.... So it's a little rapport, briefly, at first, try to get him calmed down just a little bit, see if he'll sit down in a chair, and then direct my questions toward him."

that four hours, Kyree was around several adult relatives who were presumably very upset. The only other testimony about Kyree's demeanor, other than Detective Edwards', was Michael Frerene's that Kyree acted like he did not know what was going on.[9] Even if we were to find Kyree was still under the stress of excitement caused by the startling event, the facts do not show any of his statements to Detective Edwards were spontaneous; rather, they were made in response to direct questions whether Appellant did anything to him or his sister.

¶ 31 Under these facts, we cannot find Kyree's statement to Detective Edwards admissible as an excited utterance. *See also Marquez v. State,* 1995 OK CR 17, ¶ 15, 890 P.2d 980, 984 (close attention must be paid both to the time of the statement and to the spontaneity of the statement); *McCalip v. State,* 1989 OK CR 46, ¶ 8, 778 P.2d 488, 490 (statement not shown to have been made under the stress of excitement of the startling event and was in response to mother's question and not spontaneously volunteered).

■■■■ ¶ 32 While we recognize the trial court did not admit Kyree's (last) statement as an excited utterance, the trial court opined that it "would qualify" as such in its decision to admit Kyree's statement under the residual exception to the hearsay rule. In "exceptional circumstances," section 2804.1(A) provides:

> ... a statement not covered by Section 2803, 2804, 2805, or 2806 of this title but possessing equivalent, though not identical, circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule if the court determines that:
>
> 1. The statement is offered as evidence of a fact of consequence;
> 2. The statement is more probative on the point for which it is offered than any other evidence that the proponent can procure through reasonable efforts; and
> 3. The general purposes of this Code and the interests of justice will best be served by admission of the statement into evidence.

This exception is not a firmly rooted exception to the hearsay rule. *Miller v. State,* 2004 OK CR 29, ¶ 35, 98 P.3d 738, 745.

■■■ ¶ 33 When hearsay statements do not fall within a firmly rooted hearsay exception, "they are 'presumptively unreliable and inadmissible for Confrontation Clause purposes,' and 'must be excluded, at least absent a showing of particularized guarantees of trustworthiness.'" *Paxton, id.,* 199 F.3d at 1211, *citing Idaho v. Wright,* 497 U.S. 805, 818, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). These guarantees of trustworthiness must come from "the totality of the circumstances that surround the making of the statement and that render the declarant particularly worthy of belief" and "must be at least as reliable as evidence admitted under a firmly rooted hearsay exception." *Id.* (citations omitted). Unless an affirmative reason, arising from the circumstances under which the statement was made, provides a basis for rebutting the presumption that the hearsay statement is not worthy of reliance at trial, the confrontation clause requires exclusion of the out of court statement. *Id.*

¶ 34 The trial court's determination that Kyree's statement to Detective Edwards was admissible as substantive evidence under Section 2804.1 was error. Kyree testified at trial and did not claim "lack of memory." *See* 12 O.S.Supp.2002, §§ 2804, 2804.1(A). Rather, he specifically denied making any such statement and his testimony was clear. While his demeanor at trial may have reflected he was scared to testify, his testimony on other matters relating to the abuse he and Charita suffered was specific.

¶ 35 Further, the trial court's recitation of the statutory requirements for admissibility under Section 2804.1 does not adequately show those trustworthiness guarantees, arising from the totality of the circumstances surrounding the making of the statement, which render his statement so inherently reliable as to be admissible. The trial court did not rely upon the totality of the circumstances surrounding Kyree's statement to Detective Edwards in its decision to admit the statement. Rather, the trial court con-

9. *See f. 7.*

sidered other factors—that the State wanted to use the evidence as substantive evidence, that the story "fit" the medical evidence, that the courtroom atmosphere was intimidating, and more importantly that "the interests of justice" were better served by admitting the statement because the prosecution involved a child/murder.

¶ 36 The circumstantial guarantees of trustworthiness that support admission of hearsay under the residual exception are those which existed at the time the statement was made, not those that can be added using hindsight. *Idaho v. Wright*, 497 U.S. 805, 811, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). The record does not support the trial court's decision to admit Kyree's out of court statement to Detective Edwards under the residual hearsay exception. While we understand the State's desire to use this statement as substantive evidence, the State did not need to prove the "mechanism" of death to prove its case—the State only had to show the use of unreasonable force. *See* 21 O.S.Supp.2000, § 701.1(C). Further, and contrary to the prosecutor's argument, Kyree's statement was not spontaneously made; rather, Kyree made the statement in direct response to questions posed by the detective.

¶ 37 Mitchell characterizes Kyree's statement to Detective Edwards as testimonial because it was made in direct response to structured police questioning. *Crawford*, 541 U.S. 36, 53, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004). Detective Edwards was acting in an investigative capacity for purposes of producing evidence in anticipation of a criminal prosecution and Kyree's statement/response to his questions could be considered testimonial in nature. *See e.g. People v. R. F.*, 355 Ill.App.3d 992, 292 Ill.Dec. 31, 825 N.E.2d 287 (2005)(3 year old's statements of sexual abuse in response to investigating officer's questions were testimonial in nature); *People v. Vigil*, 104 P.3d 258, 262 (Colo.App. 2004)(child's answers to police officer's open-ended, non-leading questions during non-structured, relaxed interview were testimonial). However, we need not decide this claim based upon the holding in *Crawford* and the characterization of Kyree's statements as testimonial, because Kyree testified and de-

nied saying Appellant picked Charita up by any part of her body and he was subject to cross-examination.

¶ 38 The trial court's decision to admit evidence will not be disturbed absent a showing of abuse of discretion accompanied by prejudice. *H.W. v. State*, 1988 OK CR 138, ¶ 9, 759 P.2d 214, 218. In the case of evidentiary error, the proper inquiry is whether this Court has "grave doubts" that the outcome of the trial would have been materially affected had the error not occurred. (citations omitted). *Douglas v. State*, 1997 OK CR 79, ¶ 45, 951 P.2d 651, 667, *cert. denied*, 525 U.S. 884, 119 S.Ct. 195, 142 L.Ed.2d 159 (1998).

¶ 39 The trial court abused its discretion when it admitted Kyree's statement to Detective Edwards as substantive evidence when Kyree testified and denied making it. Admission of the statement violated Mitchell's right of confrontation. This Court has grave doubts that the admission of this extremely prejudicial statement/hearsay did not affect the outcome of Mitchell's trial. While the jury was presented with compelling evidence that Charita's injuries were so severe that no reasonable explanation existed for them other than the use of unreasonable force upon her, the statement Kyree allegedly made to Detective Edwards was extremely prejudicial, was not shown to be reliable and should not have been used and relied upon as substantive evidence. We cannot be sure its admission did not ultimately affect the outcome of the case and cannot conclude its admission was harmless beyond a reasonable doubt. *Van White v. State*, 1999 OK CR 10, ¶ 32, 990 P.2d 253, 265 (constitutional error may be found harmless if the Court finds, beyond a reasonable doubt, that it did not contribute to verdict); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

¶ 40 In conjunction with other errors discussed below, we find relief is warranted and Mitchell's conviction for First Degree Murder should be reversed and remanded for a new trial.

### 2. Shawanda Rogers' Extrajudicial Accusation of Appellant

¶ 41 Mitchell also complains that, over his counsel's objection, Sharronda Rogers testified that when she arrived at the hospital Shawanda said "[h]e beat my daughter." The trial court admitted her statement as an excited utterance. The totality of the circumstances did not show Shawanda's accusatory statement that "[h]e beat my daughter" [referring to Mitchell] was an excited utterance. The trial court's decision to admit this statement constituted an abuse of discretion and was error.

¶ 42 Sharronda Rogers testified that when she arrived at the hospital, found her sister, and saw her face, she "knew something was wrong. And she looked at me and I looked at her, and her eyes was red ..." No other witness testified at trial as to Shawanda's demeanor.[10]

¶ 43 "Whether a statement qualifies as an excited utterance depends not on a fixed time but on the facts and circumstances of each case." *Williams*, 1996 OK CR 16, ¶ 17, 915 P.2d at 379. In *Williams*, moments after a shooting, the defendant/declarant told another witness it was either "them or me" and the trial court refused to admit the statement because it was self-serving. *Id.*, 1996 OK CR 16, ¶ 15, 915 P.2d at 379. There, reviewing the appellant's claim that the statement should have been admitted as an excited utterance, we noted that 12 O.S.2001, § 2803 contains no exception barring otherwise admissible statements because they are self-serving. However, we also said

> [a]s self-serving statements are inherently untrustworthy, the latter requirement is particularly important; there must be no time for reflection or fabrication. Whether a statement qualifies as an excited utterance depends not upon a fixed time but on the facts and circumstances of each case— the words should be one continuing transaction with the event.

*Id.*, 1996 OK CR 16, ¶ 17, 915 P.2d at 378–379. *See also Marquez*, 1995 OK CR 17, ¶ 16, 890 P.2d at 983 (witness statements were made spontaneously upon waking the morning after crime and there was no time for reflection); *McCalip*, 1989 OK CR 46, ¶ 6, 778 P.2d 488 (victim's statement made when questioned morning after crime; not evidence that the witness was still excited); *Hawkins v. State*, 1988 OK CR 207, ¶ 6, 761 P.2d 918, 920 (victim's statement made within ten minutes after calling for help was made under influence of startling event); *Griffith v. State*, 1987 OK CR 38, ¶ 9, 734 P.2d 303, 305 (victim's statement shortly after shooting that defendant killed unarmed second victim was made under influence of startling event); *Beavers v. State*, 1985 OK CR 146, ¶ 7, 709 P.2d 702, 704 (no fixed rule as to time and distance from the exciting event, but circumstances should exclude the idea of deliberation and fabrication).

¶ 44 While Shawanda's statement obviously related to the "startling event" of Charita's apparent beating and critical condition, the facts and circumstances shown do not call for admission of her statement as an excited utterance. The circumstances do not show her statement was made without time for reflection or fabrication. Shawanda first learned Charita was ill and even was having seizures in the morning, yet she did not go home until she finished her shift at work. She did not ask Mitchell to stop at the hospital on the way home from work. Upon her arrival home, she called her aunt and uncle to take Charita to the hospital even though they were thirty (30) minutes away. Her uncle Kevin and Michael Frerene drove her, Charita and Kyree to the hospital between 3:30 and 4:30 p.m. She did not blame Mitchell for Charita's condition to either of them. The trial record does not show whether Shawanda talked with law officers or medical personnel during the time she was at the hospital with Charita prior to making of her statement to Sharronda. The circumstances do not exclude the possibility that she knew she might also be implicated in causing Charita's injuries. These circumstances do not exclude the idea of deliberation and fabrication; the words she spoke under these cir-

---

**10.** At preliminary hearing, Detective Edwards testified Shawanda was laughing when he first saw her and was calm and did not appear scared when he spoke with her at the hospital. He did not so testify at trial.

cumstances were not one continuing transaction with the event.

¶ 45 Shawanda Rogers did not testify; she pled "the Fifth" and she was not subject to cross-examination. Admission of her accusatory statement that "[h]e beat my daughter" as an excited utterance was error, and Mitchell was denied his right of confrontation by the admission of this statement. The improper admission of this statement, viewed in isolation, might not have affected the outcome of the trial. However, considered in combination with the other instances of inadmissible hearsay and other errors occurring at trial, we cannot find its admission harmless beyond a reasonable doubt. *Miller v. State*, 2004 OK CR 29, ¶ 48, 98 P.3d 738, 748 (admission of non-testifying codefendant's statement to a third party was not harmless beyond a reasonable doubt).

3. *Hearsay within hearsay.*

¶ 46 Michael Frerene admitted he did not talk with Shawanda before they went to the hospital. However, he testified that Shawanda's aunt Gwen Hopson said that Shawanda said Mitchell did not want to take Charita to the hospital. Neither Gwen Hopson nor Shawanda testified at trial.

¶ 47 Hearsay within hearsay is not always inadmissible "if each part of the combined statements conforms with an exception to the hearsay rule provided in this Code." 12 O.S.2001, § 2805. Neither part of the referenced double hearsay statement fell within an exception to the hearsay rule. The record suggests the prosecutor did not intentionally elicit this double hearsay and trial counsel did not object to it. Our review is for plain error. *Anderson v. State*, 1999 OK CR 44, ¶ 28, 992 P.2d 409, 419, *cert. denied*, 531 U.S. 850, 121 S.Ct. 124, 148 L.Ed.2d 79 (2000); *Simpson v. State*, 1994 OK CR 40, 876 P.2d 690. Plain error is error "which go[es] to the foundation of the case, or which take[s] from a defendant a right which was essential to his defense." *Simpson*, 1994 OK CR 40, ¶ 12, 876 P.2d at 695.

¶ 48 This double hearsay was inadmissible and Mitchell was again denied his right of confrontation when it was admitted. The State submits that any error in the admission of this evidence was "slight" because other properly admitted evidence showed Mitchell could have taken Charita to the hospital sooner and did not and because the State did not argue the double-hearsay during closing argument.

¶ 49 Viewed in isolation, we might find this error harmless. However, in conjunction with the errors which occurred at trial, we cannot find it to be so. *Van White*, 1999 OK CR 10, ¶ 32, 990 P.2d at 265 (constitutional error may be found harmless if the Court finds, beyond a reasonable doubt, that it did not contribute to verdict); *Chapman*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

¶ 50 In Proposition Two, Mitchell claims the evidence was insufficient to sustain his convictions for Count 3—child abuse of Kyree Rogers or for Count 4—the sexual abuse of Charita Frerene. He submits the evidence against him on these Counts was based entirely upon circumstantial evidence and asks this Court to apply the "reasonable hypothesis" test in reviewing his insufficiency claims.

¶ 51 In *Easlick v. State*, 2004 OK CR 21, ¶ 15, 90 P.3d 556, 559, we abandoned the "reasonable hypothesis" test and adopted a unified standard of review for direct and circumstantial evidence in claims of insufficient evidence. Accordingly, this Court must determine whether, viewed in the light most favorable to the State, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Easlick, id.; Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–204.[11]

*Count 4—Sexual Abuse of Charita Frerene*

¶ 52 Charita Frerene received numerous, severe injuries shortly before her

---

**11.** We do not address Appellant's claim that the magistrate erred in binding over Appellant on Counts 3 and 4, because this claim was not properly preserved for appellate review. *Farmer v. State*, 1977 OK CR 215, ¶ 25, 565 P.2d 1068, 1072 (failure to file motion to quash prior to entering plea on the merits waives any complaint that the magistrate erred in bind-over).

presentation to the hospital. According to medical testimony, her lethal brain injuries were inflicted no earlier than the morning of July 23, 2000.[12] In addition to the severe injuries noted by medical personnel, the attending Emergency Room physician testified Charita had deep red bruising inside the labia, and her hymen had a notch at the six o'clock position. Physician's assistant Kathleen Hatlelid performed a sexual abuse examination on Charita and also testified to the bruising on the bilateral labia majora and loss of hymenal tissue. Hatlelid also testified the bruising and loss of hymenal tissue indicated "perpetrating trauma through the hymenal opening, and because of the bruising, that something had happened very recently." She said the "thinness" of the hymenal ring between 5:30 and 7:00 o'clock position indicated "multiple incidents" of penetrating trauma. She believed the bruising was recent and the last incident likely occurred within the last one to three days. She testified multiple instances of sexual abuse could have occurred within a ten day to two week period.

¶ 53 During Mitchell's videotaped interview with Detective Edwards, he said "they've told him from the hospital that this girl has been messed with." At trial, Mitchell denied he committed any sexual abuse of Charita and denied ever sexually abusing any child. Linda Washington babysat Charita and Kyree for about one month. The first day she kept them, she noticed "inappropriate touching," and spoke to Shawanda about it. The last time she kept the children, she found Kyree and Charita naked in bed, with Kyree on top of her, while they were taking a nap.

¶ 54 The State submits that "because the bruising ... was so recent, and because defendant was the sole caretaker during the relevant period of time, there was sufficient evidence for the rational juror to have found the elements of sexual abuse beyond a rea-

sonable doubt." Unfortunately, the evidence does not prove Mitchell was Charita's sole caretaker or the perpetrator of sexual abuse.

¶ 55 Although the prosecutor argued at trial that he was Charita's "sole caretaker" during the one to two days before July 23rd, the evidence did not show that to be true. Mitchell was only Charita's sole caretaker while Shawanda was working. Mitchell testified on Saturday July 22nd, when Shawanda came home from work, he told her he wanted her and her children to leave and then he left for five or six hours. Charita was crying when he came home. The State does not dispute that Shawanda was at home with the children during this time and also does not dispute that she was home with them the next morning before she left for work. Further, the State claimed the alleged sexual abuse could have occurred within a ten day to two week period, and the evidence certainly did not show Mitchell was the "sole caretaker" during that period of time.

¶ 56 We are bothered by, and are certainly not convinced by, the State's argument that Mitchell likely "snuck in and played with her vagina, too, while he was beating the life out of" Charita. The commission of the acts of physical abuse against Charita do not prove Mitchell committed any sexual abuse—although this was the State's theory and what it wanted the jury to believe. A charge of sexual abuse of a three year old child would cause any jury to view a defendant more critically and suspiciously. The evidence of sexual abuse was so slight, we believe had it been prosecuted separately from Count 1, a rational jury would not have returned a guilty verdict.

¶ 57 While a rational juror might suspect Mitchell committed sexual abuse of Charita, suspicion does not support a finding that Mitchell committed the crime "beyond a reasonable doubt." *Spuehler, id.; see also Easlick,* 2004 OK CR 21, ¶ 10, 90 P.3d at 558; *Hill v. State,* 1995 OK CR 28, ¶ 40, 898 P.2d

12. The Emergency Room attending physician said bruises continued to evolve all over her body while Charita was in the Emergency Room. These evolving bruises indicated her injuries occurred "relatively acutely" to her arrival in the Emergency Room—within one to six hours; Charita arrived there at 4:20 p.m. Dr. Gessour-

oun, head of the PICU, believed Charita's lethal (head) injuries occurred at a time consistent with 11:00 a.m.—when she first started seizing. However, he admitted the lethal brain injury could have been inflicted three hours before the seizures started (8:00 a.m.).

155, 167 (where evidence is sufficient to prove more than mere suspicion of guilt, this Court has held the evidence is sufficient). Accordingly, Mitchell's conviction and sentence for Count 4—Child Sexual Abuse—must be reversed and remanded with instructions to dismiss. The prejudice arising from the prosecution of Count 4 with the child abuse murder charge also contributes to our determination that the admission of inadmissible hearsay discussed above could not be harmless beyond a reasonable doubt.

### Count 3—Physical Abuse of Kyree Rogers

¶ 58 In Count 3, the State initially alleged Mitchell, acting co-jointly with Shawanda Rogers, "willfully or maliciously injured, tortured, maimed, or used unreasonable force upon … Kyree Anthony Rogers … by beating Kyree Anthony Rogers with an extension cord, resulting in bruising, and/or lacerations on his body …". Alternatively, the State alleged that Mitchell "permitted" the child abuse of Kyree Rogers by knowing about the abuse and failing to report it. (O.R.42–43). Mitchell was bound over on both Child Abuse or alternatively Permitting Child Abuse, but at trial, the State abandoned the permitting child abuse theory. In opening statement, the prosecutor only read the child abuse allegation in Count 3; in closing argument, the prosecutor argued that Mitchell alone caused Kyree's bruises.

¶ 59 Mitchell argues the evidence presented at trial did not prove beyond a reasonable doubt that he, rather than Shawanda, was the perpetrator of the acts which caused Kyree's bruises and that the evidence produced by the State does not amount to "child abuse" because it does not show more than "ordinary force" as contemplated by 21 O.S. 2001, § 844.

¶ 60 At the time of the crime, Title 10, Section 7115 provided, in pertinent part, that

> Any parent or other person who shall willfully or maliciously engage in child abuse … or who shall otherwise willfully or maliciously injure, torture, maim, use unreasonable force upon a child under the age of eighteen (18) … shall upon conviction be guilty of a felony….

10 O.S.Supp.1999, § 7115. The plain language of the statute does not require life-threatening or even serious injury. The extent of force necessary for a conviction under § 7115 is limited by 21 O.S.2001, § 844, which allows a parent or other person to use ordinary force as a means of discipline and which contemplates the use of instruments in such discipline. However, even though § 7115 is limited by, and would not apply to, those situations involving ordinary force, nothing in either statute suggests a certain level of injury is necessary before applied force can be considered unreasonable.

¶ 61 We are mindful of cases cited by Mitchell where we have rejected sufficiency claims where injuries inflicted were more severe than bruises.[13] Even though we often see injuries more severe than those bruises suffered by Kyree, we have never required "more than bruising" for a conviction to be sustained. In *Johnson v. State*, 1988 OK CR

---

13. *Cline v. State*, 1989 OK CR 69, 782 P.2d 399 (sufficiency challenge rejected where eighteen (18) month old's lip was split and swollen "resembling a duck's bill;" face, legs, buttocks and back bruised, and evidence showed defendant admitting spanking child); *Johnson v. State*, 1988 OK CR 54, 751 P.2d 1094 (sufficiency challenge rejected in permitting case where victim suffered bruises on back, buttocks and penis and defendant knew of beatings, could hear beatings, and knew of extreme nature of conduct); *Childs v. State*, 1987 OK CR 226, 744 P.2d 567 (sufficiency claim rejected where three (3) month old victim had bruised eye, yeast infection, spiral fracture of arm, fractured skull, fractured ribs, and medical testimony showed injuries could not have been caused by fall from couch or earlier car wreck); *Boyd v. State*, 1987 OK CR 211, 743 P.2d 674 (sufficiency claim rejected where victim was brought to hospital in a coma with bruises and retinal hemorrhages and appellants claimed injuries were the result of falls from toilet and bed); *Raymond v. State*, 1986 OK CR 51, 717 P.2d 1147 (sufficiency claim rejected where two (2) year old was brought to hospital in semi-comatose state with recent cerebral hemorrhage and over two dozen recent bruises on body and appellants claimed he had been spanked recently and had recently fallen twice); *Smith v. State*, 1979 OK CR 30, 594 P.2d 784 (sufficiency claim rejected where intoxicated defendant hit daughter in face five to ten times, causing black eye, bleeding lips and nose; defendant admitting slapping child in the face once with back of hand).

54, ¶ 7, 751 P.2d 1094, 1096, where the defendant argued "ordinary bruises" would not suffice to show the conduct proscribed by the child abuse statute, we stated:

[w]hile "ordinary bruises" may not satisfy such a standard, appellant was aware not only of the bruises, but of the severity of the beatings which could be heard in different rooms of the house, and of the extreme nature of the conduct, which included beating the victim with a belt, a tube, a brush, a yardstick, and a board. She was also aware that her husband had used clamps on the victim's hands and fingers. This evidence is sufficient for a jury to have found beyond a reasonable doubt that appellant knew that D.J. was being abused.

While some people may disagree on what "unreasonable force" means in the context of child punishment, *Johnson* shows the distinction between bruises caused by ordinary force and those caused by unreasonable force must be determined from all the facts surrounding the conduct under investigation. *Id.; see also Malicoat v. State*, 2000 OK CR 1, ¶ 14, 992 P.2d 383, 396, *cert. denied*, 531 U.S. 888, 121 S.Ct. 208, 148 L.Ed.2d 146 (2000).

¶ 62 In this case, Dr. Casas (Fjelstad) examined Kyree and found patterned bruises on his shoulder and buttocks. She believed he was bruised in areas not consistent with accidental trauma and she thought the looped pattern of the bruises was consistent with cord injury and with abuse. She testified the bruises were "less than" a month old and were not life threatening. Kyree testified Mitchell hit him with a belt and a fly-swatter and he cried when Mitchell spanked him. He did not remember his mother spanking him at all. Several items found at Mitchell's residence could have made looped pattern injuries. Mitchell admitted he spanked Kyree with his hand, but said he never struck him with the belt, hanger, fly-swatter or cord.

 ¶ 63 Where there is competent evidence from which a jury could reasonably conclude the defendant was guilty of the crime charged, this Court will not interfere with the verdict, even though there may be conflicts in the evidence from which different inferences may be drawn. *Smith v. State*, 1984 OK CR 15, ¶ 6, 674 P.2d 569, 572. Even though Kyree's bruises were not severe, a rational jury, under proper instruction, could conclude from Kyree's testimony and the medical testimony that his bruises were not the result of ordinary force or a lawful spanking and that they were inflicted by Mitchell.

 ¶ 64 Unfortunately, the jury was not properly instructed on the elements of the crime and did not consider whether Kyree's bruises might have resulted from "ordinary discipline." In Proposition Three, Mitchell complains the jury instruction on the elements of child abuse incorrectly stated the law and therefore deprived him of his right to have the State prove every element of the crime charged. We agree.

¶ 65 In Count 3, the State alleged Appellant "wilfully (sic) or maliciously injured, tortured, maimed or used unreasonable force" upon Kyree Rogers "by beating Kyree … with an extension cord resulting in bruising and/or lacerations on his body, contrary to … Section 7115 of Title 10 …" [14] However, at trial, the jury was instructed (Instruction No. 5):

No person may be convicted of Child Abuse unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:

*First*, a person willfully or maliciously engaged in;

*Second*, injuring or torturing or maiming;

*Third*, of a child under the age of eighteen;

*Fourth*, by a person responsible for the child's health or safety.

We review this claim for plain error, because there was no objection to this instruction. *Pinkley v. State*, 2002 OK CR 26, ¶ 7, 49 P.3d 756, 758; *Simpson*, 1994 OK CR 40, ¶ 12, 876 P.2d at 695.

---

14. Mitchell was charged co-jointly with Shawanda Rogers in Count 3 and was also alternatively charged with permitting child abuse co-jointly with Rogers in Count 3.

¶ 66 Oklahoma Uniform Jury Instruction No. 4–35 sets forth the elements of child abuse. OUJI–CR 2d. 4–35 (2000 Supp.) contains two alternatives, depending upon whether the person is charged with child abuse as it is defined by 10 O.S.Supp.2002, § 7115(A) or § 7102(B)(1). Neither alternative in OUJI–CR 2d. 4–35 (2000 Supp.) correctly states the elements of child abuse *as charged in this case,* because the statute in effect at the time of the crime has since been amended and the current uniform instruction tracks the language of the current child abuse statute. *See* OUJI–CR 2d. (2000 Supp.) No. 4–35; 10 O.S.Supp.2002, §§ 7115(A), 7102(B)(1).[15] Instruction No. 5, given at Mitchell's trial, is a combination of both alternatives in OUJI–CR 2d. (2000 Supp.) No. 4–35; it includes the language of the first alternative and a fourth element taken from the *second* alternative. *See* OUJI–CR 2d. (2000 Supp.) No. 4–35 (alternatives one and two).[16]

¶ 67 When Mitchell was charged in August 2000, Section 7115 of Title 10 read, in pertinent part:

Any parent or other person who shall willfully or maliciously engage in child abuse or neglect or who shall otherwise willfully or maliciously injure, torture, maim, use unreasonable force upon a child under the age of eighteen (18) ... shall upon conviction be guilty of a felony ...

10 O.S.Supp.1999, § 7115. Following the language of the statute in effect at the time, the elements of child abuse were (1) willfully or maliciously; (2) injured/tortured/maimed/used unreasonable force; (3) upon a child under the age of 18. *See* 10 O.S.Supp.1999, § 7115. Instruction No. 5 did not correctly state the elements of the crime charged as the option "used unreasonable force" in element number three was omitted and an additional "fourth" element [by a person responsible for the child's health or safety] was added.

¶ 68 Instruction No. 5 did not correctly state the elements of the crime as it was defined by the statute in July of 2000 when the offense was allegedly committed. The trial court should have utilized the uniform instruction that was applicable to the statute in effect at the time—10 O.S.Supp.1999, § 7115—which stated:

No person may be convicted of beating or injuring a child unless the State has proved beyond a reasonable doubt each element of the crime. These elements are: *First,* willful/malicious; *Second,* causing/procuring; *Third,* injury/torture/maiming/(use of unreasonable force); *Fourth,* upon a child under the age of eighteen.[17]

OUJI–CR.2d (1997 Supp.) No. 4–35.

¶ 69 In this case, the trial court did not give the uniform jury instruction that was applicable to the statute that was in effect at the time of the crime. *See f.* 15; 10 O.S.Supp.1999, § 7115; *Huskey v. State,* 1999 OK CR 3, ¶ 13, 989 P.2d 1, 7 (OUJI–CR 2d. 4–35 should be used if the defendant is charged with beating or injuring a child). Conviction for the crime with which Mitchell was charged required the State to prove he willfully or maliciously injured, tortured, maimed, or used unreasonable force upon Kyree Rogers. 10 O.S.Supp.1999, § 7115; OUJI–CR 2d. (1997 Supp.) No. 4–35.

---

**15.** The first alternative to OUJI–CR 2d. (2000 Supp.) No. 4–35 reads as follows:

No person may be convicted of child abuse unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:

*First,* a person willfully/maliciously engaged in;
*Second,* injuring/torturing/maiming;
*Third,* of a child under the age of eighteen.

OUJI–CR 2d. (2000 Supp.) No. 4–35 (alternative one).

**16.** The second alternative to OUJI–CR 2d. (2000 Supp.) No. 4–35 is intended for use in cases of willful or malicious abuse charged under 10 O.S.Supp.2002, §§ 7115(A), 7102(B)(1).

**17.** The Notes on Use to the 1997 Supplement state OUJI–CR 4–35 should be used if the defendant is charged with beating or injuring a child. The Committee Comments following OUJI–CR 2d. (1997 Supp.) No. 4–35 state: "Section 7115 of Title 10 (formerly 21 O.S.1991, § 843) creates a special battery provision that prohibits unreasonable violence upon a child by any person, regardless of whether the person has any relation to or duty of supervision over or care of the child." The Committee Comments go on to note that the "proscription does not encompass the use of reasonable force upon a child for disciplinary purposes, as set forth at 21 O.S.1991, § 844."

¶ 70 In reviewing a challenge to jury instructions, this Court considers whether the instructions as a whole fairly and accurately state the law. *Norton v. State,* 2002 OK CR 10, ¶ 17, 43 P.3d 404, 409. Failure to correctly state the elements of the crime in the jury instructions may rise to plain error. *Pinkley,* 2002 OK CR 26, ¶ 7, 49 P.3d at 758; *Roberts v. State,* 2001 OK CR 14, ¶ 17, 29 P.3d 583, 589. Deviation from the uniform instructions does not warrant reversal unless such error results in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right. *Fontenot v. State,* 1994 OK CR 42, ¶ 55, 881 P.2d 69, 84–85.

¶ 71 In this case, the instructions given, as a whole, did not accurately state the law with respect to Count 3, and we find plain error occurred. Still, reversal is not warranted if we find the error was harmless beyond a reasonable doubt. *Ellis v. Ward,* 2000 OK CR 18, ¶ 4, 13 P.3d 985, 986; *Primeaux v. State,* 2004 OK CR 16, ¶ 89, 88 P.3d 893, 907–908, *cert. denied,* — U.S. —, 125 S.Ct. 371, 160 L.Ed.2d 257 (2004); *Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 1833, 144 L.Ed.2d 35 (1999)(jury instruction omitting element of offense was error subject to harmless error analysis); 20 O.S.2001, § 3001.1.

¶ 72 Instruction No. 6, taken from the applicable provisions of OUJI–CR 2d. (2000 Supp.) No. 4–40D, defined unreasonable force as "[m]ore than that ordinarily used as a means of discipline." Title 21, Section 844 provides that "nothing contained in this Act [referring to the Oklahoma Child Abuse Reporting and Prevention Act—renumbered as 10 O.S. § 7115 by Laws 1995, HB 1933, c. 353, § 20, eff. November 1, 1995] shall prohibit any parent, teacher or other person from using ordinary force as a means of discipline, including but not limited to spanking, switching, or paddling." 21 O.S.2001, § 844.[18] Mitchell submits the misinstruction of the jury on the elements of the crime cannot be found harmless, because without the missing clause (used unreasonable force), the jury could not properly consider Instruction No. 6 and did not assess Kyree's bruises

in the context of legal corporal punishment. Again, we agree.

¶ 73 During his videotaped interview, Mitchell admitted he had spanked Charita and Kyree. At trial, he admitted he spanked Kyree for calling "his mama a bitch." He said he never hit Kyree with the hanger, flyswatter, cord, or belt, but he saw Shawanda do those things. From Mitchell's admissions, it is clear his defense to Count 3 was not that he never struck Kyree, but that he did not use unreasonable force to injure Kyree.

¶ 74 The State urges this Court to find the elements given in Instruction No. 5 "increased the burden on the State beyond that which was required" because the State was not required to prove Appellant was "a person responsible for the child's health or safety." The State claims the omission of the fourth alternative in the second element (used unreasonable force) raised the State's burden rather than lessened it. The State also argues

> Assuming a case where one used unreasonable force on a child—such as might cause some pain beyond that necessary for discipline, for instance—that nevertheless fell *short* of injuring the child, or torturing him, or maiming him, then in that case, omission of the element of "use of unreasonable force" would inure to defendant's benefit. Although he violated section 7115, the jury would not convict him.

(Br. of Appellee at 32)(emphasis in original). The State claims any error in the omission of the "use of unreasonable force" alternative was harmless beyond a reasonable doubt.

¶ 75 While we agree that the additional "fourth" element, which the State was not required to prove, theoretically made its burden greater, this particular element under the facts of this case was not in dispute or particularly difficult to prove; the addition of this fourth element was not prejudicial to Mitchell. However, this case is not all that different from the "unreasonable force without injury" scenario advanced by the State. The evidence did not show Kyree suffered the kind of extreme and severe injuries nor-

---

18. This statute has not been amended since its enactment in 1963.

mally seen in child abuse cases;[19] the evidence certainly did not show or even suggest that he was tortured or maimed. The evidence showed then four year old Kyree had approximately five (5) bruises, varying in size from two to five centimeters, which could have been anywhere from one day to one month old.[20]

¶ 76 While Kyree's bruises could be described as injuries and the statute does not require a certain level of injury, the bruises were not shown to be either recent or severe. Even though Kyree testified Mitchell spanked him with a belt and a fly-swatter, the use of instruments in "ordinary discipline" is not prohibited by our statutes. *See* 21 O.S.2001, § 844. Further, it is not beyond the realm of reason that bruises might result from "ordinary discipline" when such an instrument is used. As we noted previously, while there may be some disagreement on what "unreasonable force" means in the context of child punishment, the distinction between bruises caused by ordinary force and those caused by unreasonable force must be determined from all the facts surrounding the conduct under investigation. *Johnson*, 1988 OK CR 54, ¶ 7, 751 P.2d at 1096; *see*

*also Malicoat*, 2000 OK CR 1, ¶ 14, 992 P.2d at 396.

¶ 77 Under these circumstances, where the State, pursuant to Instruction No. 5, was only required to prove Mitchell "injured, tortured, or maimed" Kyree without the jury deciding whether his injuries—five bruises—could have been the result of ordinary discipline, *i.e.* force that was not unreasonable, we cannot find the error in the omission of the "used unreasonable force" language harmless beyond a reasonable doubt. Under these facts, we find Mitchell's conviction for child abuse as alleged in Count 3 must be reversed and remanded for a new trial.[21]

¶ 78 We have identified serious first stage errors in Propositions One, Two, and Three which warrant relief on all Counts. The evidence presented was insufficient to sustain Mitchell's conviction for Count 4—Child Sexual Abuse—and Count 4 is therefore reversed and remanded with instructions to dismiss. Count 3—Child Abuse—is reversed and remanded for a new trial based upon the instructional error identified in Proposition Three. Mitchell's conviction for First Degree Murder—Count 1—is reversed and remanded for a new trial because the improper

19. *See* cases cited in *f.* 13. *See also Cherbonnier v. State*, 1988 OK CR 55, ¶¶ 2–3, 751 P.2d 1098, 1099 (Six year old with bruises on back, ribs, buttocks and penis and rope mark on neck; defendant admitted bruising the child and telling him he was going to tie him up and put him in the river and kill him); *Davis v. State*, 1988 OK CR 153, ¶ 3, 759 P.2d 1033, 1034 (victim had burns, bruises and broken bones); *McIntosh v. State*, 1991 OK CR 49, ¶ 2, 810 P.2d 373, 374 (victim had numerous head-to-toe bruises, burn on shoulder, bump on forehead, gouges in tissue behind his ear, hair missing from head, experiencing pain, unable to stand up, vomiting); *Walters v. State*, 1993 OK CR 4, ¶ 2, 848 P.2d 20, 22 (victim had broken arm and fractured skull); *Coon v. State*, 1978 OK CR 131, ¶¶ 2, 4, 587 P.2d 1373, 1374 (victim unconscious and in critical condition, covered with burns and bruises); *Mays v. State*, 1974 OK CR 127, ¶ 4, 524 P.2d 55 (Sixteen month old bruised on buttocks and thighs, black eye, bleeding lips, cut on stomach).

20. Kyree testified Mitchell "spanked" him with a belt and the hard end of the fly-swatter. Dr. Casas–Fjelstad, who examined Kyree at the hospital, testified "[o]n my diagnosis, I have ecchymosis, or bruises, and suspect physical abuse-child abuse." She suspected abuse caused the bruises rather than accident because of the "loop

pattern" and the bruises were in areas "you wouldn't expect accidental trauma." She asked Kyree if he had pain, and "he denied that he had any pain." She asked if anyone had hurt him and "he denied it." Dr. Casas–Fjelstad did not "date" the bruises; she testified they could be from one day to one month old. State's Exhibit 72 showed Kyree had a "2½ to 3 cm. ecchymosis" on his right arm, a "loop mark ecchymosis" on his right thigh measuring "5 cm long × 2 cm," a "4 cm × 4 cm" ecchymosis on his left buttocks; another ecchymosis on the back side of his left thigh; an ecchymosis on his upper right buttock measuring "4 cm × 2 cm;" and the diagram notes "loop marks" (with two drawn in) on the right upper thigh.

21. We cannot be certain the jury would have convicted on this offense had it not been tried with the murder charge. The prejudicial effect of knowing the injuries Charita suffered obviously affected the jury in this case—that is evident by the one thousand (1,000) year sentence it imposed for this Count where the only injuries were shown to be minor bruises of an undetermined age. On retrial, the prejudicial effect of joinder of these offenses should be considered. *See Gilson v. State*, 2000 OK CR 14, ¶ 46, 8 P.3d 883, 904–05, *cert. denied*, 532 U.S. 962, 121 S.Ct. 1496, 149 L.Ed.2d 381 (2001).

admission of inadmissible hearsay violated his constitutional right of confrontation.

¶ 79 In Proposition Eleven, Mitchell claims the accumulation of error at trial deprived him of due process of law and a reliable sentencing proceeding. Other errors occurred during the course of this trial which need not be addressed because we have granted relief on all counts. However, on retrial, we caution the State of Oklahoma to be mindful of the boundaries of proper and acceptable prosecutorial argument and conduct.

¶ 80 We are extremely offended by the prosecutor's argument encouraging the trial court to admit the inadmissible hearsay in this case because it would "only be reviewed for harmless error anyway." Harmless error analysis occupies an important and necessary place in appellate review. It serves a useful purpose because it discourages setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial. *Chapman*, 386 U.S. at 22, 87 S.Ct. at 827. "[T]here may be some constitutional errors which in the setting of a particular case are *so unimportant and insignificant* that they may, consistent with the Federal Constitution, be deemed harmless, not requiring automatic reversal of the conviction." (emphasis added) *Id.* Harmless error review should not be used as an excuse for the prosecutor to encourage, or the trial court to commit, intentional error.

¶ 81 The prosecutor exceeded the boundaries of proper conduct numerous times during this trial. The prosecutor's "[w]here was God" questions to Mitchell were not only argumentative, but were inflammatory and were clearly improper. *Marshall v. State*, 1975 OK CR 120, ¶ 42, 537 P.2d 423, 430. Both prosecutors improperly focused the jury's attention on sympathy for the victim during first stage closing arguments. *Garrison v. State*, 2004 OK CR 35, ¶ 117, 103 P.3d 590, 610–611 (guilt phase of a capital trial is no place for appeals for victim sympathy) The prosecutor's sexual predator arguments were improper, were not a fair characterization of Mitchell under the facts of this case, and were prejudicial. *Cf. Hanson v. State*,

2003 OK CR 12, ¶ 15, 72 P.3d 40, 49–50. Further, closing argument is not the time to attack the defendant's character with personal opinions. The prosecutor's "empty chair" argument was improper, particularly as it was the prosecutor's first statement following defense counsel's closing argument. *Coulter v. State*, 1987 OK CR 37, ¶ 31, 734 P.2d 295, 302 (argument which ridicules defense counsel's defense as air defense is improper).

¶ 82 Because we grant relief on all Counts, the other errors and numerous instances of prosecutorial misconduct do not require further relief. This Court, in reaching its decision that the admission of inadmissible hearsay could not be deemed harmless beyond a reasonable doubt and requires reversal of Mitchell's First Degree Murder conviction and sentence of death, considered all of the errors which occurred at trial. We remind the State and the trial courts that where numerous irregularities occur during the course of the trial that tend to prejudice the rights of the defendant, reversal will be required where the cumulative effect of all the errors denied the defendant of a fair trial. *Lockett v. State*, 2002 OK CR 30, ¶ 43, 53 P.3d 418, 431, *cert. denied*, 538 U.S. 982, 123 S.Ct. 1794, 155 L.Ed.2d 673 (2003).

### DECISION

For the reasons set forth previously in this Opinion, Mitchell's convictions in Oklahoma County District Court, Case No. CF 2000–4712, for First Degree Murder and for Child Abuse (Counts 1 and 3), are ***REVERSED AND REMANDED FOR NEW TRIAL;*** Mitchell's conviction for Child Sexual Abuse (Count 4) is ***REVERSED AND REMANDED WITH INSTRUCTIONS TO DISMISS.***

CHAPEL, P.J., WINCHESTER and A. JOHNSON, JJ., concur.

LUMPKIN, V.P.J., concurs in result.